# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

ISAAC LAWRENCE BOWLING,

      Defendant-Appellant.

UNPUBLISHED
May 24, 2018

No. 336769
Saginaw Circuit Court
LC No. 16-042448-FJ

Before: METER, P.J., and GADOLA and TUKEL, JJ.

PER CURIAM.

Defendant was convicted following a jury trial of conspiracy to commit home invasion, MCL 750.110(a)(2), conspiracy to commit breaking and entering, MCL 750.110, and breaking and entering, MCL 750.110. He was sentenced to concurrent prison terms of 12 to 20 years on the conspiracy to commit home invasion conviction and 6 to 10 years on the conspiracy to commit breaking and entering and the breaking and entering convictions. We affirm.

The victim testified that he lived at a home in Chesaning, Michigan. While in bed at around 6:00 a.m. on November 6, 2015, the victim heard two loud "crash" sounds. After getting dressed, he came upon "a man with a gun in his hand."[1] The invader asked the victim for his money, and the victim turned over all the cash in his wallet. After taking the money, the invader looked for a box of money that he thought was hidden in the victim's freezer and then left the house. Afterward, it was discovered that an accordion also was stolen from a vehicle parked in the garage.

Jorden Kulhanek accepted a plea agreement,[2] in which he agreed to testify against defendant. Kulhanek explained that the night before the home invasion, he and defendant discussed what they could do for money, and they decided to break into cars. Kulhanek testified

---

[1] The victim stated that he was unable to see the perpetrator's face, mainly because the perpetrator also had a small flashlight and "always" shined it at the victim's face.

[2] Kulhanek had pleaded guilty to first degree home invasion, three counts of felony-firearm, conspiracy to break and enter a building, and breaking and entering.

that during their car-breaking spree, which spanned many cities, defendant mentioned that he wanted to go to a house in Chesaning. Kulhanek said that after they arrived at the house, they talked about breaking into a car. Kulhanek testified that defendant broke into the victim's vehicle, and after they drove a bit away, defendant expressed his intention to return and break into the house. Kulhanek stated that he drove defendant back to the Chesaning house and dropped him off. While defendant broke into the house, Kulhanek drove around and "work[ed] [his] way back." Kulhanek shortly thereafter received a text message from defendant that stated, "Come back!!" Kulhanek quickly drove back to the house and picked defendant up, at which point defendant stated that he had robbed "the man in the house."

There was a series of text messages between defendant and Kulhanek, and it was confirmed that the "Come Back!!" message was sent from defendant's phone to Kulhanek's phone on November 6, 2015, at 6:02 a.m. Additionally, a cell records analysis, which involved mapping and plotting cell phone locations, placed defendant's and Kulhanek's phones in close proximity to the crime scene at the time of the text messages.

Defendant presented the testimony of Thomas Wheaton, who explained that Kulhanek had admitted to him that Kulhanek was the one who executed the home robbery because defendant did not want to go inside the house. Wheaton also said that Kulhanek told him that Kulhanek tied up the victim during the robbery. The court allowed the testimony solely for impeachment purposes against Kulhanek.

Defendant also presented several witnesses who testified as to his alibi that he was at the home of Cliff Ostrander, his mother's boyfriend, at the time the crimes were committed. Defendant also testified that he was not at the crime scene on November 6, 2015. He testified that he was sleeping at Ostrander's house and that on that day, he had left his cell phone with his friend, Brian Tappen (Kulhanek's younger brother), because he anticipated being in detention on November 6 for probation violations. Defendant also testified that the phone was not returned to him until around February 3, 2016. Defendant further testified that when he was released from detention in early February 2016, he attempted to contact Kulhanek, but Kulhanek would not return his phone calls. On cross-examination, defendant stated that, after being unable to make contact with Kulhanek, he sent text messages to Tappen's girlfriend, Ashley Plowman. But defendant said that he did not recall telling Plowman in those messages that he needed to talk to Kulhanek because he was concerned that Kulhanek was "talking to the cops." Instead, defendant claimed that he was just generally concerned about Kulhanek's welfare because he was not returning defendant's phone calls. Defendant's testimony was contrary to Plowman's testimony in rebuttal set forth below.

In rebuttal, the prosecution called several witnesses. Shane Sims was called to impeach Wheaton's testimony. Sims testified that he spent time in jail with Wheaton and that Wheaton named defendant as being one of the perpetrators of the home break-in in Chesaning, contrary to Wheaton's testimony which only implicated Kulhanek. The prosecution also called Plowman to the stand. Plowman testified that in February 2016, defendant texted her, "I pray to God he [Kulhanek] ain't talkin." When Plowman asked what defendant meant, defendant responded, "to the ops [sic]." Also in rebuttal, Tappen testified that (1) defendant never loaned his phone to Tappen and (2) Tappen in any event did not use defendant's phone to set him up for the robbery.

## I. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant argues that he is entitled to a new trial because he was denied the effective assistance of counsel when his trial attorney failed to impeach Kulhanek with Kulhanek's handwritten letter, which indicated that Kulhanek's attorney had forced him to make false admissions to accept his plea agreement. We disagree.

We first note that defendant preserved his claim of ineffective assistance of counsel by moving for a new trial and/or *Ginther*[3] hearing in the trial court. *People v Wilson*, 242 Mich App 350, 352; 619 NW2d 413 (2000); *People v Hurst*, 205 Mich App 634, 641; 517 NW2d 858 (1994). However, because defendant's motion for an evidentiary hearing was denied, our review is for mistakes apparent on the record. *People v Horn*, 279 Mich App 31, 38; 755 NW2d 212 (2008). Claims of ineffective assistance of counsel involve "a mixed question of law and fact." *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). The Court "must find the facts, and then must decide whether those facts constitute a violation of the defendant's constitutional right to effective assistance of counsel." *Id*. "A trial court's findings of fact, if any, are reviewed for clear error, and this Court reviews the ultimate constitutional issue arising from an ineffective assistance of counsel claim de novo." *People v Petri*, 279 Mich App 407, 410; 760 NW2d 882 (2008). A trial court's finding of fact is clearly erroneous "if the reviewing court is left with a definite and firm conviction that the trial court made a mistake." *People v Armstrong*, 490 Mich 281, 289; 806 NW2d 676 (2011).

To establish ineffective assistance of counsel, "the defendant must show that counsel's representation fell below an objective standard of reasonableness," in addition to establishing "that the deficient performance prejudiced the defense." *Strickland v Washington*, 466 US 668, 687-88; 104 S Ct 2052; 80 L Ed 2d 674 (1984). "[D]efendant must overcome the strong presumption that his counsel's action constituted sound trial strategy under the circumstances." *People v Toma*, 462 Mich 281, 302; 613 NW2d 694 (2000).

> A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." [*Strickland*, 466 US at 689.]

With respect to prejudice, defendant must establish that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Toma*, 462 Mich at 302-303.

---

[3] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

The handwritten letter, addressed to the trial judge, states:[4]

> My name is Jordan Kulhanek. I'm writing you this letter to tell you my lawyer is misrepresenting me. He's talked me into taking this plea. He lead [sic] me to believe something other than what's happening. He had me say things I didn't do to except [sic] this plea. He does not respond to any of my letters. And when I see him at court he doesn't listen to anything I tell him. I need a lawyer who is going to represent me the right way.

Defendant overstates the importance of this letter. First, the thrust of Kulhanek's letter is to request new counsel; it was not to rescind his plea or recant any particular statement. Second, and contrary to defendant's claims at the trial court, in the letter Kulhanek did not state that he lied at defendant's trial. Indeed, the letter was dated August 23, 2016, and defendant's trial did not start until two months later in October 2016. At most, Kulhanek asserted that he lied during his allocution when he accepted his plea deal. And the transcript of that plea hearing shows that defendant was asked by the court whether anyone made any threats or promises to get him to enter his guilty plea, to which Kulhanek answered, "No." Kulhanek also told the court that he was pleading guilty because he was guilty and it was his choice, and his choice alone, to plead guilty. All told, defendant testified three times under oath, and in each of those instances, he consistently described himself as driving to the Chesaning house, with defendant going inside to rob it. In addition to testifying at his plea hearing, Kulhanek also testified at defendant's preliminary examination and at defendant's trial. Importantly, Kulhanek testified at defendant's trial *after* he wrote his letter. Thus, Kulhanek certainly was aware at the time of defendant's trial of any purported "tricks" or misdeeds his attorney carried out on him, but he still testified consistently with his allocution at his plea hearing. Therefore, in light of Kulhanek's consistent statements under oath, which occurred both before and after he wrote his letter, we are convinced that any attempt to impeach Kulhanek with the letter dated August 23, 2016, would not have had the effect defendant desires. Indeed, looking past the sheer lack of details or specifics in Kulhanek's letter, recantation testimony traditionally is regarded as suspect and untrustworthy. *People v Canter*, 197 Mich App 550, 559; 496 NW2d 336 (1992). As a result, defense counsel could have reasonably concluded that to attempt to impeach with the use of the letter would have been pointless.

---

[4] We note that this letter is not contained within the lower court record for this case. It initially was submitted to the trial court in Kulhanek's criminal case, not defendant's. Because "this Court's review is limited to the record established by the trial court, and a party may not expand the record on appeal," *Sherman v Sea Ray Boats, Inc*, 251 Mich App 41, 56; 649 NW2d 783 (2002), we normally would not consider the letter. However, although defense counsel admitted that he should have submitted the letter with his motion at the trial court, the trial court nonetheless stated that it had viewed the letter. Consequently, because the record indicates that the trial court considered the letter, we will as well. Presumably, the trial court, which presided over Kulhanek's criminal proceeding, saw the letter in conjunction with that proceeding.

Importantly, defense counsel did not decide simply to leave Kulhanek's credibility uncontested. Indeed, the record indicates that counsel examined and challenged Kulhanek's testimony at length during cross-examination. Counsel questioned Kulhanek about his motives for accepting his plea agreement and the favorable treatment he received pursuant to it, such as a more favorable sentence, prospective enrollment under the Holmes Youthful Trainee Act, MCL 762.11, and dismissal of additional criminal charges. Moreover, the questions posed suggest a trial strategy of eliciting Kulhanek's self-interested motives for testifying against defendant during cross-examination and reserving impeachment for more specific, direct testimony from other witnesses during rebuttal. In addition to presenting several witnesses to formulate defendant's alibi, defendant's trial attorney called Wheaton to testify during rebuttal, in which he stated that Kulhanek was the one who was involved with the break-in at the Chesaning house.

In light of trial counsel's strategy of impeachment and alibi recounted above, defendant has not rebutted the strong presumption that his trial counsel's performance constituted sound trial strategy, and his claim thus fails. Defense counsel's decision to focus his impeachment of Kulhanek through these other, more effective and specific means, was completely reasonable under the circumstances.

Moreover, even if defendant could establish that his counsel's performance fell below an objective level of reasonableness, he has nonetheless failed to establish that counsel's deficiency "was so prejudicial to him that he was denied a fair trial," or that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Toma*, 462 Mich at 302. As the trial court opined, there is not a reasonable likelihood that, had defense counsel used the letter to impeach Kulhanek, the outcome would have been different. First, as already discussed, defense counsel's failure to impeach Kulhanek with this specific piece of evidence did not amount to a complete failure to impeach his testimony. There is nothing to suggest that presenting the letter would have influenced the jury to disbelieve Kulhanek if it believed his testimony against defendant in spite of Wheaton's testimony.

Additionally, the other evidence offered against defendant corroborated or otherwise supported Kulhanek's testimony. The cell phone records corroborated Kulhanek's testimony that he dropped off defendant and waited on the road for him before defendant returned to the vehicle. Specifically, Kulhanek testified that he received a text message from defendant, "telling me to come back and pick him up," and there was confirmation that defendant sent a text message to Kulhanek on November 6, 2015, at 6:02 a.m., stating, "Come back!!" And it was established that defendant's and Kulhanek's cell phones were within close proximity to the victim's residence at the time of the crime. Considering the amount of evidence against defendant, it would be unreasonable to assert that the dubious additional impeachment of Kulhanek which the letter may have afforded would have had any greater impact on the jury than the impeachment of him through another witness. Therefore, defendant has failed to establish either of the two prongs for ineffective assistance of counsel, i.e., inadequate representation and prejudice, and the trial court thus properly denied defendant's request for a new trial.

## II. LATE ENDORSEMENT OF WITNESS

Defendant next argues that the trial court erred when it permitted the prosecution to call Shane Sims for rebuttal. We disagree.

At trial defendant argued that Sims could not testify because he was not listed on the prosecution's Alibi Rebuttal Witness List, pursuant to MCL 768.20. Defendant specifically pointed out that Sims was not mentioned on that list and the Alibi Rebuttal Witness List expressly stated, "The people will notify defendant if other witnesses are later identified." The trial court allowed Sims to testify because he was not a true alibi rebuttal witness—he was only being called to impeach the credibility of defendant's alibi witness—and the prosecution was not limited to only presenting rebuttal to defendant's alibi defense but rather could present any proper rebuttal testimony. On appeal, relying solely on MCL 768.40a, defendant argues that the trial court erred when it allowed Sims to testify. Because defendant's objection at the trial court was not based on a violation of MCL 768.40a, the issue is not preserved for appellate review. See *People v Asevedo*, 217 Mich App 393, 398; 551 NW2d 478 (1996) ("An objection based on one ground at trial is insufficient to preserve an appellate attack based on a different ground."). We therefore review this unpreserved evidentiary issue for plain error affecting defendant's substantial rights. *People v Coy*, 258 Mich App 1, 12; 669 NW2d 831 (2003).

MCL 767.40a provides in relevant part:

> (1) The prosecuting attorney shall attach to the filed information a list of all witnesses known to the prosecuting attorney who might be called at trial and all res gestae witnesses known to the prosecuting attorney or investigating law enforcement officers.

> (2) The prosecuting attorney shall be under a continuing duty to disclose the names of any further res gestae witnesses as they become known.

> (3) Not less than 30 days before the trial, the prosecuting attorney shall send to the defendant or his or her attorney a list of the witnesses the prosecuting attorney intends to produce at trial.

> (4) The prosecuting attorney may add or delete from the list of witnesses he or she intends to call at trial at any time upon leave of the court and for good cause shown or by stipulation of the parties.

Without citing a particular subsection, defendant argues that this statute requires the prosecution "to disclose new witnesses as they become known." Defendant presumably is referring to MCL 767.40a(2), the only provision dealing with a continuing duty to disclose, which provides that "[t]he prosecuting attorney shall be under a continuing duty to disclose the names of any further res gestae witnesses as they become known." However, the plain language of the statute imposing the continuing duty to disclose only extends to the names of res gestae witnesses. "Res gesate," Latin for "things done," refers to "a person who witnesses some event in the continuum of a criminal transaction and whose testimony will aid in developing a full disclosure of the facts." *People v O'Quinn*, 185 Mich App 40, 44; 460 NW2d 264 (1990),

overruled on other grounds by *People v Koonce*, 466 Mich 515, 516; 648 N2d 153 (2002); see also *Black's Law Dictionary* (10 ed) (defining "res gestae witness" as "[a] witness who, having been at the scene of an incident, can give firsthand account of what happened.").

Here, Sims was not a res gestae witness. He did not witness any part of the crimes that were the subject of trial. Instead, Sims was called to impeach the testimony of Wheaton. Sims merely testified about discussions he previously had with Wheaton, in which Wheaton described both defendant *and* Kulhanek as having been involved in the Chesaning break-in, which was contrary to Wheaton's testimony where he said that *only* Kulhanek was involved. Clearly, Sims had no firsthand knowledge regarding who broke into the Chesaning house and was only relaying what Wheaton had told him. Accordingly, because Sims was not a res gestae witness, the prosecution had no duty to disclose his existence under MCL 767.40a(2); defendant has failed to prove any plain error, and his claim fails.[5]

### III. SCORING OF OFFENSE VARIABLE 10

Defendant next argues that the trial court erroneously scored Offense Variable (OV) 10 at 15 points for predatory conduct. We disagree.

A trial court's factual findings pertaining to the scoring of guidelines variables are reviewed for clear error and "must be supported by a preponderance of the evidence." *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). Under the clear error standard, this Court will not displace a trial court's factual findings unless this Court is left with a definite and firm conviction that a mistake was made. *People v Thompson (On Remand)*, 314 Mich App 703, 708; 887 NW2d 650 (2016). However, whether the facts found by the trial court are adequate to trigger the scoring of a particular guidelines variable is a question of statutory interpretation that we review de novo. *Hardy*, 494 Mich at 438.

OV 10 is scored for the exploitation of a vulnerable victim. Points may be assessed under this OV when the exploitive conduct was directed against a vulnerable victim and the vulnerability was readily apparent, in that the victim was susceptible to injury, physical restraint, persuasion, or temptation. *People v Cannon*, 481 Mich 152, 157-158; 749 NW2d 257 (2008). But if an offender did not exploit a victim's vulnerability, as defendant suggests is the case here, then zero points are properly scored for OV 10. MCL 777.40(1)(d). A court properly scores OV 10 at 15 points when "[p]redatory conduct was involved." MCL 777.40(1)(a). " 'Predatory conduct' means preoffense conduct directed at a victim . . . for the primary purpose of

---

[5] We note that defendant in his brief on appeal mentions in his introduction to this issue that both Sims and Plowman were not endorsed as witnesses. To the extent that defendant intended to argue that allowing Plowman to testify also was erroneous, that issue is abandoned, as defendant focused his argument solely on witness Sims. See *People v McPherson*, 263 Mich App 124, 136; 687 NW2d 370 (2004) ("The failure to brief the merits of an allegation of error constitutes an abandonment of the issue."). In any event, like Sims, Plowman was not a res gestae witness, and any reliance on MCL 767.40a(2) as to her also is misplaced.

victimization." MCL 777.40(3)(a). Thus, "to assess 15 points for OV 10, a court must find that an offender engaged in predatory conduct and exploited a vulnerable victim, using only the statutory definition of 'vulnerability.' " *People v Huston*, 489 Mich 451, 466; 802 NW2d 261 (2011). And "MCL 777.40(3)(c) defines 'vulnerability' as 'the readily apparent susceptibility of a victim to injury, physical restraint, persuasion, or temptation,' and such vulnerability may or may not arise from the explicitly listed characteristics, relationships, and circumstances set forth in subdivisions (b) and (c)." *Id.*, quoting MCL 777.40(3)(c). Notably, susceptibility does not have to arise from a victim's inherent traits—it can arise from external circumstances as well. *Huston*, 489 Mich at 466. The test boils down to the trial court answering the three following questions:

> (1) Did the offender engage in conduct before the commission of the offense?
>
> (2) Was this conduct directed at one or more specific victims who suffered from a readily apparent susceptibility to injury, physical restraint, persuasion, or temptation?
>
> (3) Was victimization the offender's primary purpose for engaging in the preoffense conduct? [*Cannon*, 481 Mich at 161-162.]

Here, the trial court scored OV 10 at 15 points and relied on the fact that the victim was asleep when the break-in occurred. The court further agreed with the prosecution that defendant went to the Chesaning house initially the night of the robbery and afterward, went back again, this time to break into the house. The court also noted that "there was also this testimony about the defendant telling [Kulhanek] that he heard this couple kept money in their freezer, and he wanted to go there, and go after that. And I think that falls within the predatory conduct, as described." The court's factual findings are not clearly erroneous. The victim testified that he had woken up at 6:00 a.m. from his alarm clock and thereafter heard the two "crash" sounds. While the victim was awake when he heard the crashes and encountered defendant, it is conceivable that defendant already had been in the house awhile before the crashes occurred; therefore, the victim may have been asleep at the time of the actual break-in.[6] Thus, we are not left with a definite and firm conviction that the trial court made a mistake when it found that the victim was asleep at the time of the break-in. Further, the trial court's other findings are supported by a preponderance of the evidence because Kulhanek testified that after he and defendant stole from the victim's car, they left the area and immediately returned to have defendant break-in to the house, and Kulhanek testified that defendant selected the Chesaning house specifically because he heard that there was money stored in the freezer there.

---

[6] Indeed, the victim testified that he woke up at 6:00 a.m., but there was evidence that defendant texted Kulhanek at 6:02 a.m. asking to be picked up from the Chesaning house after the robbery. With such close proximity between these two times, a natural inference is that defendant broke into the house before 6:00 a.m. In other words, it seems highly improbable that defendant broke into the house, made crash sounds, encountered the victim, robbed the victim, searched the freezer, and left the house all within two minutes.

Now, whether these facts are sufficient to qualify as predatory conduct under MCL 777.40(1)(a) is a separate question. Our Supreme Court has explained that "predatory conduct"

> does not encompass *any* "preoffense conduct," but rather only those forms of "preoffense conduct" that are commonly understood as being "predatory" in nature, e.g., lying in wait and stalking, as opposed to purely opportunistic criminal conduct or "preoffense conduct involving nothing more than run-of-the-mill planning to effect a crime or subsequent escape without detection." [*Huston*, 489 Mich at 462 (emphasis in original), quoting *Cannon*, 481 Mich at 162.]

We find *Huston* instructive. In *Huston*, the Supreme Court held that a person who is lying in wait to rob a victim who just happens to wander by in a parking lot constituted predatory conduct. *Huston*, 489 Mich at 463-464. The Court noted that, while the defendant may not have been lying in wait for a specific victim, he nonetheless was lying in wait for a victim; thus, the conduct was directed at a victim. *Id.* at 463. The Court relied heavily on the reason why the defendant chose to lie in wait—"he was doing this in order to place himself in a better position to be able to successfully rob someone in the parking lot." *Id.* Here, defendant broke into the victim's house during the early morning hours, when he necessarily figured the home's residents would be asleep. As in *Huston*, defendant here directed preoffense conduct toward the victim, where such conduct went beyond "run-of-the-mill planning." Just before deciding to break into the Chesaning house, defendant went to the house and stole from the victim's car. And defendant selected a time to break into the house when he naturally thought that the victim would be sleeping, which would make the victim more vulnerable. Thus, similarly to the defendant in *Huston*, defendant here directed this preoffense conduct at the victim in the Chesaning house so he could "place himself in a better position to be able to successfully rob" him. Accordingly, we hold that the trial court did not err when it scored OV 10 at 15 points for predatory conduct.

Affirmed.

/s/ Patrick M. Meter
/s/ Michael F. Gadola
/s/ Jonathan Tukel