*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

In re STEPHAN, Minors.

UNPUBLISHED
February 7, 2019

No. 343178
Oakland Circuit Court
Family Division
LC No. 2016-844340-NA

Before: GLEICHER, P.J., and STEPHENS and O'BRIEN, JJ.

PER CURIAM.

Respondent appeals as of right the trial court's order terminating her parental rights to the minor children, BS and CS, under MCL 712A.19b(3)(c)(*i*), (g), and (j). We affirm.

Respondent first argues that petitioner failed to make reasonable efforts toward reunification, particularly given her intellectual deficiencies. We disagree. We review for clear error a trial court's finding whether reunification efforts were reasonable. *In re Fried*, 266 Mich App 535, 542-543; 702 NW2d 192 (2005). A finding is clearly erroneous where the reviewing court is left with a definite and firm conviction that a mistake has been made. *In re Terry*, 240 Mich App 14, 22; 610 NW2d 563 (2000). When reviewing the trial court's findings of fact, we defer to the special opportunity of trial court to judge the credibility of the witnesses. *In re Fried*, 266 Mich App at 541.

"Under Michigan's Probate Code, the Department has an affirmative duty to make reasonable efforts to reunify a family before seeking termination of parental rights," but the "Department also has obligations under the [Americans with Disabilities Act (ADA), 42 USC 12101 *et seq*.,] that dovetail with its obligations under the Probate Code." *In re Hicks*, 500 Mich 79, 85-86; 893 NW2d 637 (2017). In *In re Terry*, this Court explained:

> In enacting the ADA, Congress stated that "the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals." 42 USC 12101(a)(8). With these goals in mind, the ADA provides in pertinent part:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity. [*In re Terry*, 240 Mich App at 24, quoting 42 USC 12132.]

The *In re Terry* Court held that the ADA requires public agencies like the Department of Health and Human Services (DHHS) to make reasonable accommodations for those individuals with disabilities, so "the reunification services and programs provided by the [DHHS] must comply with the ADA." *Id*. But regardless of a parent's disability, there is a commensurate responsibility on the part of a parent to participate in and benefit from the services provided. *In re Frey*, 297 Mich App 242, 248; 824 NW2d 569 (2012). "If a parent cannot or will not meet her irreducible minimum parental responsibilities, the needs of the child must prevail over the needs of the parent." *In re Terry*, 240 Mich App at 28 (quotation marks and citation omitted).

The ADA defines a "disability" as "a physical or mental impairment that substantially limits one or more major life activities of such individual," "a record of such an impairment," or "being regarded as having such an impairment." 42 USC 12102(1). For purposes of the ADA, "major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 USC 12102(2)(A).

The trial court did not clearly err by finding that petitioner made reasonable efforts to reunify respondent and the children. When respondent notified the court at her plea hearing in August 2016 that she was enrolled in and attended some special education classes before graduating from high school, the court ordered a psychological evaluation. When the psychological evaluation had not been completed by the end of January 2017, the court emphasized its importance given respondent's explanation of her cognitive abilities and the need to craft appropriate services for her. A psychological evaluation was completed just days later. The psychologist reported that respondent fully understood the purpose of the evaluation, and that respondent was oriented, her memory was adequate, her perception of events and circumstances was good, and she had no difficulty comprehending questions.

Despite the first psychological report, respondent's counsel expressed additional concern about whether respondent adequately understood the proceedings and requested the appointment of a guardian ad litem (GAL) or a Court Appointed Special Advocate (CASA) worker for respondent because she appeared to be having difficulty with her parent-agency treatment plan (PATP). The court ordered another psychological evaluation before considering whether a GAL was appropriate. The second psychologist, Dr. Bernard Gaulier, determined that respondent was "somewhat intellectually limited," would have difficulty with complex problem-solving, and, given her fourth-grade reading level, would benefit from written information in simple, layman's terms. Dr. Gaulier recommended that more time be provided to respondent for reunification. Based on this report, the court allowed respondent additional time for reunification, but concluded that respondent did not require any additional, specialized services and that she was capable of completing the requirements of her PATP.

Ashley Johnson, the foster care case manager, testified that the Ennis Center for Children accommodated respondent's reading deficit by repeatedly meeting with her and explaining what she needed to do. Johnson also testified that written communications were provided in simple language.[1] Johnson testified that the agency offered to help respondent contact service providers and provide a business card to have the service provider contact the agency directly. The Ennis Center workers also picked respondent up from her home and drove her to parenting-time visitations because she had been unable to pass a driver's test. And because of respondent's cognitive limitations, she received referrals for special one-on-one parenting classes. She could not be reached to arrange the first set of classes, but was re-referred and received 14 weeks of training at the beginning of 2017. For each visit, the instructor visited with respondent and her children and then, after the visit, reviewed any concerns or highlights, and made suggestions about what to do differently.

Johnson opined that respondent's failure to comply with her PATP requirements was not the result of respondent's intellectual functioning or a misunderstanding of what was required, but rather was a choice not to comply. Johnson explained that respondent would often start participating in services before hearings, but then quit afterward. Respondent missed many of BS's appointments for his special needs and missed all of CS's appointments. Respondent admitted that she did not have transportation and, even though she knew the Ennis Center would drive her, she did not want to ask for help. Dr. Gaulier testified that when the court was paying close attention, respondent would comply, but opined that respondent would discontinue her efforts and revert to "maladaptive behavior" once she was not under close supervision. Based on the services tailored to address respondent's needs, and in light of respondent's apparent failure to participate in and benefit from the services provided, *In re Frey*, 297 Mich App at 248, the trial court did not clearly err by finding that the DHHS provided reasonable efforts, *In re Fried*, 266 Mich App at 542-543.

Respondent argues that the DHHS did not provide reasonable efforts because the trial court should have appointed a CASA worker or the agency should have assigned her a parent partner. But, as explained, the trial court concluded that respondent did not require additional, specialized services because respondent's second psychological evaluation showed that she was capable of completing the PATP. Dr. Gaulier also reported that, at the psychological evaluation, he and respondent discussed the court proceedings so that she understood the purpose and the parties' roles, and Dr. Gaulier believed that respondent understood and retained what she had learned. Lastly, because respondent did not participate in and benefit from the range of services

---

[1] Respondent argues that the agency should not have been sending her letters after learning of her reading deficit. But Dr. Gaulier did not recommended that workers forgo all written communication with respondent; he only recommended that workers write in simple language if they were going to communicate with respondent through writing. Respondent does not cite any letters or any language used therein to demonstrate that the written communications sent to respondent were not written in simple language as recommended by the psychologist and planned by the Ennis Center.

provided to her, she cannot establish that she would have availed herself of a CASA worker's or parent partner's aid, had such aid been provided.[2]

Respondent also argues that her drug and alcohol testing was thwarted by a $14 balance at JAMS, which she claimed she could not afford to pay. She complains that the agency never worked with JAMS to help resolve the balance. While the record does not suggest that anyone from the agency actually went to JAMS with respondent, Johnson testified that she called JAMS to investigate respondent's claims and found them to be baseless. According to Johnson, a representative from JAMS told her that respondent never came to test, and that if a person in respondent's situation came to test, she would not be charged because JAMS would seek reimbursement from the agency. The trial court appeared to credit Johnson's testimony and not respondent's, and we defer to the trial court's superior position to judge the credibility of the witnesses that appear before it. *In re Fried*, 266 Mich App at 541.

Respondent also claims that the agency should have provided her with bus tickets to get to JAMS. But respondent never claimed below that she failed to participate in screens due to transportation problems. If she had, there is nothing to suggest that the agency would not have aided respondent in finding transportation, especially in light of the agency's efforts picking respondent up from her home for parenting-time visits. Ultimately, on this record, respondent has failed to establish that the trial court clearly erred by determining that reasonable efforts were made to reunify respondent and the children.

Next, respondent argues that she was denied the effective assistance of counsel for various reasons. Because respondent did not raise her claim of ineffective assistance of counsel in a motion for a new trial or request a *Ginther*,[3] review of this issue is limited to facts apparent on the record. *People v Jordan*, 275 Mich App 659, 667; 739 NW2d 706 (2007).

"[A]lthough child protective proceedings are not criminal in nature, where the right to effective counsel arises from the Sixth Amendment, the Due Process Clause indirectly guarantees effective assistance of counsel in the context of child protective proceedings." *In re HRC*, 286 Mich App 444, 458; 781 NW2d 105 (2009). "The principles applicable to claims of ineffective assistance of counsel in the arena of criminal law also apply by analogy in child protective proceedings; therefore, it must be shown that (1) counsel's performance was deficient, falling below an objective standard of reasonableness, and that (2) the deficient performance prejudiced the respondent." *In re Martin*, 316 Mich App 73, 85; 896 NW2d 452 (2016). Effective assistance is presumed, and respondent bears a heavy burden of proving otherwise. *People v Vaughn*, 491 Mich 642, 670; 821 NW2d 288 (2012). Respondent must "overcome the strong presumption that counsel's performance constituted sound trial strategy." *In re Martin*, 316 Mich App at 85.

---

[2] In addition, as the Ennis Center noted, respondent never requested a parent partner.

[3] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

Respondent first complains that counsel was ineffective for allowing her to enter a no-contest plea despite believing her to be intoxicated. This claim is based on a misunderstanding of the record. On September 19, 2016, respondent's counsel stated that she recalled smelling alcohol on respondent on the morning of the *preliminary hearing*, when she first met respondent. The preliminary hearing—the first hearing that respondent and respondent's counsel attended together—occurred on July 20, 2016. Respondent did not enter her no-contest plea until August 3, 2016. Respondent therefore fails to establish the factual predicate for her claim that counsel improperly allowed her to enter a plea with knowledge that she was under the influence of alcohol. See *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999) (explaining that a defendant raising a claim of ineffective assistance of counsel bears the burden of proving the factual predicate of his or her claim).

Respondent also argues that defense counsel's disclosure that respondent previously smelled of alcohol constituted a breach of confidence, which was prejudicial to respondent because the court ordered screening that ultimately caused the termination of respondent's parental rights. We disagree.

At the September 19, 2016 hearing, respondent was not present, and the trial court asked, "At this point -- why aren't we doing drug screens or something? Something is something seems to be off where mom is not here this morning . . . ." The GAL responded first and stated that there was no explanation for respondent's absence. Johnson, from the Ennis Center, then stated, "We can do drug screens, your Honor. Mom denied any substance abuse history and that was the report I received . . . and so that's what I worked with." Respondent's counsel then stated, "Your Honor, when I first met my client at the prelim I asked her about drug addiction, alcohol addiction, she denied it to me, and yet that very morning I could smell alcohol so I believe she needs a PACE assessment." Although the court had already ordered a PACE assessment, it added drug screening to respondent's PATP following this exchange.

The American Bar Association's Standards of Practice for Attorneys Representing Parents in Abuse and Neglect Cases provides in Standard 26 that attorneys shall "[e]ngage in case planning and advocate for appropriate social services using a multidisciplinary approach to representation when available."[4] The United States Supreme Court has held that ABA standards are guides regarding reasonable conduct of counsel. *Strickland v Washington*, 466 US 668, 688; 104 S Ct 2052; 80 L Ed 2d 674 (1984). Applying Standard 26 here, respondent's counsel may have been attempting to proactively identify and, if needed, get appropriate treatment for a possible substance abuse problem. See *Vaughn*, 491 Mich at 670 (explaining that a reviewing court is to affirmatively entertain the range of possible reasons counsel may have had for proceeding as they did). When counsel made the remarks at issue, reunification was still the goal. It was not unreasonable for counsel to try to identify a potential drug problem early on so that, if there was a problem, it could be treated and would not become a barrier to reunification

---

[4] ABA *Standards of Practice for Attorneys Representing Parents in Abuse and Neglect Cases* <https://www.americanbar.org/content/dam/aba/administrative/child_law/ParentStds.authcheckd am.pdf> (accessed January 2, 2019).

later. This explains why counsel reiterated the need for a PACE assessment: to identify a substance abuse problem, if one existed.

That said, even if it was sound strategy for counsel to reiterate the need for a PACE assessment, we must consider whether counsel's ancillary remark about smelling alcohol on respondent constituted ineffective assistance. It is difficult to say whether that remark caused the trial court to order respondent to participate in drug screens, particularly in light of the trial court and Johnson's exchange directly before the remark was made. Assuming that the remark did cause the trial court to order respondent to participate in drug screens and that it was objectively unreasonable for counsel to make that remark, respondent cannot establish that she was prejudiced by counsel's performance. The result of counsel's performance was that respondent was ordered to participate in drug screens, which she continually failed to do. Respondent was not prejudiced by being *ordered* to participate in drug screens; if she was prejudiced, it was due to her *failure to participate* in the drug screens. In other words, any prejudice came from *respondent's* failure, not counsel's performance. Also, as will be explained in more detail later, respondent's barriers to reunification stretched beyond her failure to participate in drug screens, so it cannot be said that "but for counsel's . . . errors, the result of the proceeding would have been different." *People v Randolph*, 502 Mich 1, 9; 917 NW2d 249 (2018) (quotation marks and citation omitted).[5]

Next, respondent argues that counsel was ineffective for telling the court that respondent had possibly married her boyfriend, Gerardo Reyes, as well as telling the court that respondent's grandmother said that she and Reyes did not get along, that the grandmother had an expired PPO against him, and that Reyes would control and confuse respondent. Respondent does not clearly explain how these remarks were prejudicial, and instead asserts that the statements "caused additional requirements to be placed on" respondent, like ending "her relationship with [Reyes] and find[ing] a new place to live." But there was no question that respondent would be required to move from her apartment with Reyes because it was not large enough to accommodate her

---

[5] Respondent seems to suggest that counsel breached attorney-client privilege by disclosing the smell of alcohol on respondent. But contrary to respondent's suggestion, counsel did not breach any attorney-client privilege because the privilege only attaches to confidential communications made by a client to his or her attorney. *Reed Dairy Farm v Consumers Power Co*, 227 Mich App 614, 618; 576 NW2d 709 (1998).

Respondent also asserts in passing that the PACE assessment and screening should not have been ordered by the court. Despite that the issue is not properly before this Court because it is raised as a part of respondent's ineffective assistance claim, respondent's assertion is meritless. When the trial court ordered respondent to participate in the PACE assessment and drug screening, the trial court was aware that CS may have fetal alcohol syndrome and that respondent may have been using alcohol before the preliminary examination. The trial court was also aware that respondent was missing scheduled court dates without any explanation as to why. Thus, the trial court was rightfully concerned with respondent's potentially irresponsible use of alcohol and how it was affecting her behavior, and those concerns would be put to rest through respondent's participation in the PACE assessment and drug screening.

children. As for whether respondent would have been required to break up with Reyes, it is unclear how this was prejudicial. First, respondent did, in fact, break up with Reyes, and so she was not prejudiced by that requirement. Second, and more importantly, respondent testified at the best-interest hearing that Reyes's controlling behavior prevented her from taking action in this case, so her separating from him can hardly be said to have prejudiced her. Lastly, as a general matter, Reyes's poor relationship with the grandmother was documented in the guardianship file, and the court took judicial notice of that file at the statutory-basis hearing, so that information would have been before the trial court regardless. Because respondent cannot establish that, but for counsel's statements, the outcome of the proceeding would have been different, her claim of ineffective assistance fails. See *Randolph*, 502 Mich at 9.

Respondent further argues that defense counsel was ineffective for failing to make additional requests for accommodations because of her intellectual and reading deficits. Respondent argues that counsel failed to renew the request for a GAL or CASA worker after the psychological evaluation, failed to request a parent partner from the Ennis Center, failed to help respondent contact JAMS about the fee for her drug tests, and failed to ask the Ennis Center to stop sending her written communications. As indicated earlier, the trial court addressed the need for additional, specialized services after respondent's psychological evaluation and found that the evaluation demonstrated that she did not require such services and was capable of completing the PATP. Therefore, any renewed objection for an assistant, such as a CASA worker or a GAL, would have been meritless. "Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010). With respect to the JAMS screening, respondent cannot establish prejudice because the record demonstrated that she was not going to JAMS for screening and, if she had, she would have been screened for free. Moreover, although respondent argues that counsel should have asked the Ennis Center to stop sending written communications, Johnson testified that documents were written in simple language, and respondent fails to point to any communications that she did not understand.

Finally, with no citation to the record, respondent argues that counsel was ineffective because she failed to request more time for respondent to complete the PATP, and she instead conceded that a statutory-basis for termination had been established. "The failure to brief the merits of an allegation of error constitutes an abandonment of the issue." *People v McPherson*, 263 Mich App 124, 136; 687 NW2d 370 (2004). Regardless, the record does not support respondent's arguments. The record demonstrates that counsel repeatedly advocated for additional time, particularly given respondent's intellectual disabilities.

Respondent's complaint regarding counsel's concession to a statutory ground for termination appears to be based on counsel's closing argument at the statutory-basis hearing. At that time, counsel admitted that there was clear and convincing evidence to support termination, but maintained that there were outstanding issues that had not been adequately explored, including "the drug testing issue, the therapy requirement issue, and . . . that Ennis and DHHS has not done all reasonable activity to enable [respondent] to be reunited with her children." "The purpose of closing argument is to allow attorneys to comment on the evidence and to argue their theories of law to the jury." *People v Finley*, 161 Mich App 1, 9; 410 NW2d 282 (1987). Whether and how to conduct a closing argument is a matter of trial strategy. See *In re Ayres*, 239 Mich App 8, 23; 608 NW2d 132 (1999). As discussed further below, there was

overwhelming evidence to support the trial court's conclusion that clear and convincing evidence demonstrated a statutory basis for termination. Instead of championing a meritless argument regarding the sufficiency of that evidence, defense counsel argued that reasonable efforts had not yet been made to reunify the family. Termination of parental rights is improper where reasonable efforts at reunification have not been made. *In re Hicks*, 500 Mich at 85-86. We conclude that respondent has failed to overcome the strong presumption that counsel's choice of argument constituted sound trial strategy.

Ultimately, when viewing all of respondent's ineffective assistance claims, even if we were to assume that counsel's performance fell below an objective standard of reasonableness, we do not believe that respondent is entitled to a relief. All of the issues raised by respondent either concerned evidence that was presented through other means or they were not otherwise outcome determinative. And because respondent cannot establish prejudice, she is not entitled to relief. See *In re Martin*, 316 Mich App at 85.

We next address respondent's argument that the trial court erred by finding clear and convincing evidence to support termination of her parental rights under MCL 712A.19b(3)(c)(*i*), (g), and (j). This Court "review[s] for clear error a trial court's finding of whether a statutory ground for termination has been proven by clear and convincing evidence." *In re Moss*, 301 Mich App 76, 80; 836 NW2d 182 (2013).

The trial court found that termination of respondent's parental rights was justified under MCL 712A.19b(3)(c)(*i*), (g), and (j), which, at the time the trial court entered its order, permitted termination under the following circumstances:

> (c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:
>
> (*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.
>
> * * *
>
> (g) The parent, without regard to intent, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.[6]

---

[6] MCL 712A.19b(3)(g) was amended by 2018 PA 58, effective June 12, 2018. As amended, § 19b(3)(g) now provides:

* * *

(j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

The trial court did not clearly err by finding that clear and convincing evidence supported termination of respondent's parental rights under MCL 712A.19b(3)(c)(*i*). Respondent does not dispute that more than a year had passed since issuance of the initial dispositional order.[7] Respondent has never provided sole care and custody for her children. Respondent and BS lived with the grandmother from BS's birth until he was approximately one year old, at which time respondent agreed to a guardianship with the grandmother. When CS was born, the infant was immediately placed in the grandmother's care. The guardianship with the grandmother ended due to the grandmother's poor health and another couple took over the guardianship. But they requested that the guardianship be terminated when BS was five years old and CS was 2½ years old, which lead to the instant proceedings.

These proceedings began because, as stated in the petition, respondent was "homeless, and therefore cannot provide for care and placement of the children" when their guardianship was terminated. The trial court ordered respondent to obtain appropriate housing and employment. When the trial court issued this order, respondent was living in a hotel, but she claimed that she planned to rent an apartment the following month. Five months later, she still had not moved into an apartment. By the time of the statutory-basis hearing, respondent was once again in temporary housing and had failed to inform the Ennis Center where she and her new boyfriend were living. Thus, just like when the proceedings began, respondent only had a plan to move to a two-bedroom apartment to accommodate her family. And because she had not yet moved, the agency had not inspected the apartment to determine if it was appropriate.

During the guardianship proceedings, respondent received services for employment, but stopped participating and failed to stay in touch with the service provider. When the instant proceedings began, she claimed to be working at McDonald's, but did not provide proof of her employment as required by the PATP. Leading up to and during the statutory-basis hearing, she continued to claim that she held various jobs, but she never provided verifiable proof.

Throughout the current proceedings, respondent visited the children consistently and completed her parenting class. Yet, in spite of this progress, respondent's visits were always supervised at the agency, and, at the time of the statutory-basis hearing, respondent continued to struggle with caring for both children at once.

---

The parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

[7] The initial dispositional order was entered on August 12, 2016.

-9-

In light of the continued problems with respondent's ability to care for the children, her lack of appropriate housing, and her unverifiable employment, we are not left with a definite and firm conviction that the trial court erred by finding clear and convincing evidence that the conditions that led to the adjudication continued to exist.

And there was no reasonable likelihood that the conditions would be rectified within a reasonable time. By the time of the statutory-basis determination in November 2017, BS had been outside of respondent's care since November 2012 and CS had been outside of respondent's care since her birth. For years, respondent showed a pattern of starting but not completing services, despite the psychologist's conclusion that respondent understood what was required of her. The petition in this case was filed in July 2016, and in the sixteen months since then, respondent had not made any significant progress on her barriers to reunification. Indeed, respondent had never had verifiable employment and still only had a plan to acquire suitable housing. On this record, the trial court did not clearly err by finding that there was no reasonable likelihood that respondent would resolve her continuing issues within a reasonable time.

Respondent argues that she should have been given more time and more assistance with services given her intellectual deficits. But as we concluded earlier, the trial court did not clearly err by determining that petitioner made reasonable efforts to reunify respondent and the children. Moreover, following the recommendation from the second psychological evaluation, the court, in fact, gave respondent additional time to reach her goals in the PATP, but the problems continued.

In sum, clear and convincing evidence supported a statutory basis for termination under MCL 712A.19b(3)(c)(*i*). If at least one ground for termination exists, this Court need not consider the additional grounds on which the trial court based its decision. *In re HRC*, 286 Mich App at 461.

Finally, respondent argues that termination of her parental rights was not in the children's best interests. We disagree. We review for clear error a trial court's determination regarding a child's best interests. MCR 3.977(K); *In re Mason*, 486 Mich at 152.

Once a statutory ground for termination is established, the trial court shall order termination of parental rights if it finds that termination is in the child's best interests. MCL 712A.19b(5). "[W]hether termination of parental rights is in the best interests of the child must be proved by a preponderance of the evidence." *In re Moss*, 301 Mich App at 90. The trial court should weigh all the evidence available to it in determining a child's best interests. *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014). Factors relevant to a determination of a child's best interests include the child's bond to the parent, the parent's compliance with his or her case service plan, the parent's history of visitation with the child, the child's need for permanency, stability, and finality, the advantages of a foster home over the parent's home, and the possibility of adoption. *Id*. at 713-714.

A preponderance of the evidence supports the trial court's determination that termination of respondent's parental rights was in the children's best interests. Even though respondent had not cared for BS since he was a baby, respondent and the six-year-old shared a bond. In contrast, Johnson expressed concern that CS lacked a secure bond with anyone and had no caregiver

preference. Respondent's bond with BS tended to weigh against termination, while respondent's apparent lack of bond with CS tended to support termination.

For most of the proceedings, respondent failed to substantially comply with the PATP. In the approximate two months between the statutory-basis hearing and the best-interest hearing, respondent made progress with verifiable employment, housing, and weekly, random drug screenings. Dr. Gaulier believed, however, that respondent's recent cooperation with the PATP was the result of close supervision by the court and the agency, and if the supervision was not in place, she would discontinue her efforts and revert to "maladaptive behavior." Like Dr. Gaulier, the trial court questioned the sincerity of respondent's recent efforts to comply with her PATP, especially in light of the sixteen months before the statutory-basis hearing during which respondent substantially failed to comply with her PATP. While the trial court's skepticism was perhaps warranted, respondent's compliance with her PATP tended to weigh against termination.

Respondent consistently visited the children once a week at the agency. BS looked forward to her visits, and respondent was loving and playful. But according to the caseworker, respondent focused most of her attention on BS. While respondent's participation in visits tends to weigh against termination, her inability to properly care for both children tends to support that termination was in CS's best interests.

Also, the worker that supervised respondent's visits was concerned that respondent appeared unable to deescalate BS's behavior. Both BS and CS have special needs. Dr. Gaulier opined that respondent's low IQ could make parenting in out-of-the-ordinary situations—like addressing the children's special needs—difficult for her to problem solve, and her fourth-grade reading level could make it difficult for her to help the children with school. Dr. Gaulier opined that BS needed a parent who would be skilled in understanding his needs and following through with the school and service providers to make sure that his needs were met. In that vein, the trial court expressed concern that respondent only had a "superficial understanding" of BS's needs and how to address them, and Dr. Gaulier opined that respondent would be unable to address BS's needs without extensive assistance. The trial court was also concerned that respondent would not be able to address the children's special needs because she continually failed to go to appointments. Johnson testified that despite having notice of BS's appointments, respondent had not been attending. She opined that, if respondent could not get there alone, she would not be able to take BS to the appointments if she had custody. The trial court shared Johnson's concerns because, if the children were returned to respondent, she would be responsible for getting them to their doctor's appointments. Respondent's inability to comprehend the scope of the children's needs, her unreliability in attending the children's doctor's appointments, and the uncertainty of whether respondent would be able to get the children to their doctor's appointments, all tend to support that termination was in the children's best interests.

The trial court was also concerned because respondent had not proven that she could care for the children on her own. Though respondent had suitable housing at the time of the best-interest hearing, the housing was dependent on respondent's boyfriend at the time. As the trial court pointed out, that relationship was relatively new, and there was no guarantee that it would last. This was troubling given that, if the relationship ended, then respondent would be unable to independently provide suitable housing for the children. The trial court chalked this up to an apparent pattern of respondent "expecting others to care for her," and concluded that she

would not "be able to care for the children [if] she needs someone to care for her." Respondent's dependency on others to meet her children's needs, and her inability to meet those needs independently, tends to support that termination was in the children's best interests.

Respondent argues that it is not bad parenting to need help from others, but the trial court was concerned that respondent could not parent by herself. Because respondent's relationships tended to not be long-term, the people on whom she relied for help with the children could not be reasonably relied on for extended periods. For example, in the summer of 2017, respondent was planning to parent with one boyfriend, but by the fall of 2017 she claimed that a new boyfriend planned to assist her. The trial court expressed concern that the people who respondent relied on might not be available long-term, and if they were not available, respondent would need to be able to provide for the children independently, which she had not demonstrated that she could do.

Although, as respondent notes, the children had been placed in multiple foster care homes, both children responded well to the structure of their final foster home and their behavior had been improving. The foster mother had concerns that both children would act out after visits with respondent, and "it takes the children a while to readjust to the structure that she provides." Dr. Gaulier wrote in the report that BS's foster mother was "appropriately meeting his needs and is following through with mental health and schools services as needed for [BS]." In contrast, the trial court was skeptical about whether respondent would be able to meet the children's needs, as already explained. The advantages of the foster placement and the foster family's ability to provide stability and permanence for the children tend to support that termination was in the children's best interests.

In sum, despite that some factors tended to support that termination was not in the children's best interest, other factors—particularly concerns about respondent's ability to understand and address the children's special needs and respondent's dependency on others for care for the children—tended to support that termination was in the children's best interests. On this record, the trial court did not clearly err in finding by a preponderance of the evidence that termination of respondent's parental rights was in the children's best interests.

Affirmed.

/s/ Elizabeth L. Gleicher
/s/ Cynthia Diane Stephens
/s/ Colleen A. O'Brien

-12-