PEOPLE v McPHERSON

Docket No. 242767. Submitted May 6, 2004, at Detroit. Decided July 20, 2004, at 9:10 A.M. Leave to appeal sought.

Lanier McPherson was convicted by a jury in the Wayne Circuit Court of first-degree murder and other crimes in a second trial after a jury had deadlocked at a first trial. During the second trial, the court, Annette Berry, J., admitted a hearsay statement from an accomplice taken at an earlier time, the accomplice being dead at the time of trial and, therefore, unavailable for cross-examination. The defendant appealed, arguing that such a hearsay statement ought not be admitted without the opportunity for cross-examination.

The Court of Appeals *held*:

1. Because the statement was hearsay, it could not be admitted for the purpose of establishing the truth of the matter asserted. However, the admission of the statement was not introduced to prove its substance, but to demonstrate that the defendant was aware of the statement, that he had changed his story several times, and that he could not be believed. Admission of the statement for those reasons does not violate the Confrontation Clause of US Const, Am VI.

2. The defendant's Sixth Amendment right to counsel was not violated because he gave his several inconsistent statements to various police officers before any adversarial judicial proceeding began against him, at which time the Sixth Amendment right to counsel would have attached.

3. The defendant's Fifth Amendment right to counsel was not violated with respect to certain of his statements to the police. The trial court allowed testimony relating to the differing statements the defendant had given different police officers. Giving the trial court deference due its determinations regarding the credibility of witnesses and considering that the defendant signed an advice-of-rights form before giving the statements, the defendant gave the statements voluntarily and they were properly admitted.

4. To show that the limitation of the cross-examination by the defense of a prosecution witness is a violation of the Sixth

Amendment right to counsel, the defense must preserve the issue and show that the defendant was denied a reasonable opportunity to test the truthfulness of a prosecution witness on any material issue. In this case, trial counsel's mere statement that the court's limitation of cross-examination of a witness, which cross-examination had included numerous repetitive questions, denied the defendant's Six Amendment right of confrontation failed for two reasons. First, counsel did not preserve the issue by placing on the record what relevant evidence he was unable to present or what issues he was unable to adequately explore because of the trial court's limitation. Second, the record does not indicate that the trial court precluded the defendant from placing before the jury any facts from which bias, prejudice, or lack of credibility might be inferred.

Affirmed.

1. EVIDENCE — HEARSAY — CONFRONTATION CLAUSE — CHALLENGE TO DEFENDANT'S CREDIBILITY.

Hearsay evidence that is admitted not to establish the truth of the matter asserted, but to demonstrate that the defendant was aware of the statement and that defendant was not credible, does not violate the right to confront witnesses (US Const, Am VI).

2. CONSTITUTIONAL LAW — SIXTH AMENDMENT — RIGHT TO COUNSEL — BEFORE ADVERSARIAL JUDICIAL PROCEEDINGS.

The Sixth Amendment right to counsel does not attach until adversarial judicial proceedings are initiated against a defendant (US Const, Am VI).

3. CONSTITUTIONAL LAW — SIXTH AMENDMENT — RIGHT TO COUNSEL — LIMITATION OF CROSS-EXAMINATION.

For the defense to demonstrate in a criminal trial that a limitation by a trial court of the cross-examination of a witness constituted a violation of the defendant's right to counsel, the defense must show that it was denied a reasonable opportunity to test the truthfulness of a prosecution witness on any material issue, and the defense must preserve the issue on the record by listing what relevant evidence it was unable to present or what issues it was unable to adequately explore because of the limitation by the court (US Const, Am VI).

*Michael A. Cox*, Attorney General, *Thomas L. Casey*, Solicitor General, *Kym L. Worthy*, Prosecuting Attorney, *Timothy A. Baughman*, Chief of Research, Train-

ing, and Appeals, and *Ana I. Quiroz*, Assistant Prosecuting Attorney, for the people.

State Appellate Defender (by *Chari K. Grove*) for the defendant.

Before: SAAD, P.J., and SAWYER and FORT HOOD, JJ.

SAAD, P.J. Four "friends" were involved in the shooting of two victims, Abdul Scott and Max King, one of whom, Mr. Scott, died. One of the four friends, defendant Lanier McPherson, at first pointed the finger at Delano Gaffney, later confessed that he was the shooter, but claimed self-defense and then later claimed that Cherell King was the shooter. And, Gaffney pointed the finger at Cherell King, who, in turn, implicated McPherson, Gaffney, and Dorsey. Cherell King later was murdered by Gaffney and Dorsey, both of whom were convicted of the second-degree murder of Mr. King. McPherson was twice tried for the murder of Scott; the first trial was declared a mistrial because the jury was deadlocked and, in the second trial, the jury convicted defendant and this appeal followed.

A jury convicted defendant Lanier McPherson (defendant) of first-degree murder,[1] felon in possession of a firearm,[2] and possession of a firearm during the commission of a felony.[3] The trial court sentenced defendant to life imprisonment for the first-degree murder conviction, a concurrent $3^1/_2$- to 5-year term of imprisonment for the felon in possession conviction, and a consecutive five-year term for the felony-firearm conviction. Defendant appeals his convictions and sentences, and we affirm.

---

[1] MCL 750.316(1)(a).

[2] MCL 750.224f.

[3] MCL 750.227b.

I. FACTS AND PROCEDURAL HISTORY

On April 24, 2002, a jury found defendant guilty of the fatal shooting of Abdul Scott.[4] Shortly after the August 19, 2000, shooting in issue, the prosecution charged defendant, Delano Gaffney, and Marcelle Dorsey in this case, but at the preliminary examination, the charges against Gaffney and Dorsey were dismissed for insufficient evidence because Cherell King,[5] who had implicated defendant, Gaffney, and Dorsey, failed to appear at the hearing. King, who was present with defendant, Gaffney, and Dorsey at the time of the shooting, was murdered before defendant's trial, and Gaffney and Dorsey were convicted of second-degree murder for the killing of King.

Defendant was tried in January 2002, but the trial court declared a mistrial because the jury was deadlocked. The jury in the second trial returned the convictions from which defendant appeals. At trial, the prosecution's theory of the case was that defendant, accompanied by Dorsey, Gaffney, and King, shot the victims because earlier on the day of the shooting the victims had laughed about the fact that Gaffney's car was stolen. Though defendant admitted at trial that he was present during the shooting, he claimed that King shot the victims.

Lucretia Thompson, defendant's girlfriend at the time of the shooting, testified that Gaffney, Dorsey, and King were defendant's friends. Thompson testified that on the morning of August 19, 2000, she drove King, defendant, and defendant's uncle to a funeral home on

---

[4] Another victim, Max King, was shot during the incident, but did not die from his wounds.

[5] To avoid confusion, we will refer to Cherell King as "King," and Max King as "Max," or collectively with Scott as "the victims."

West Grand Boulevard in Detroit. Defendant asked Thompson to take a gun home with her and told her that the gun was not his, but that he did not want it at the funeral home. Defendant placed the gun under the driver's seat of the car, and Thompson drove home, but, later, defendant phoned her and told her to "forget it, bring it back." Thompson drove back to the funeral home, at which time defendant took the gun from the car.

Montez Meadows testified that on the morning of August 19, 2000, after she left an adult foster care home located at the intersection of West Grand Boulevard and Linwood, she saw two men (the victims) walking on West Grand Boulevard. She and the two men stood at the corner, waited for the traffic signal to change so they could cross the street, and she witnessed a car screech to a halt in front of them. Meadows testified that defendant and another person got out of the car and began running toward Meadows and the two men and that the two unknown assailants were shooting at them. Meadows and the two men she was standing with fell to the ground; both men were shot. Meadows testified that both defendant and the other man from the car had a gun, and that both were firing their guns, but she did not know which of the two guns fired the bullets that struck the victims.[6] Understandably fright-

---

[6] The police recovered eight shell casings at the scene and a total of two bullets from the victims. A police forensic examiner testified that the eight shell casings were fired by the same nine-millimeter handgun and that the two bullets retrieved from the victims were fired by the same nine-millimeter or .38-caliber handgun. However, it is not clear from the record, and indeed the police witness testified that he could not determine, whether the bullets recovered from the victims were fired by the same weapon from which the eight casings were expelled. Other than the testimonial evidence provided by Meadows, the tangible or physical evidence is inconclusive with respect to whether there were one or two handguns fired during this incident.

ened, Meadows crawled into the foster care home and hid, and continued to hide even after the police arrived.[7] Scott ultimately died of his injuries, and Max, who was injured, did not appear at defendant's trial.

Nearly three months after the shooting, on November 22, 2000, the police arrested King and defendant, and, on November 23, Investigator Barbara Simon of the Detroit Police Department interviewed defendant about the shooting. Defendant initially claimed ignorance of the event and then became belligerent, at which point Simon ended the interview. Defendant claims he asked for an attorney and that Simon refused.

On Friday, November 24, 2000, Investigator Terrill Shaw took a statement from King. Shaw showed this statement to Investigator James Fisher, who took a formal statement from defendant that afternoon. The statement contained yet another story about what happened on August 19, 2000: Gaffney complained that his car was stolen, and he said he thought he knew who had taken it. Gaffney told defendant to have Thompson bring Gaffney's gun to him. Gaffney, Dorsey, and King drove around in a Jeep Cherokee until Gaffney saw the victims, handed his gun to King, and told King to "smoke both of them." After some shots were fired, Gaffney got out of the Jeep and into another vehicle, while King returned to the Jeep, and defendant and Dorsey drove away. Investigator Fisher told defendant that he did not believe defendant's story and arranged for defendant to be interviewed by Investigator Andrew Sims, who specialized in polygraph examinations.

On Sunday, November 26, 2000, Sims, the polygraph specialist, interviewed defendant, and defendant initially told a story similar to the written statement he

---

[7] The police contacted Meadows approximately 1½ years later, and she testified at two pretrial hearings.

gave to Fisher. Sims told defendant he did not believe his story, and defendant again changed his story and finally made a written statement in which he admitted that he shot the victims, but claimed self-defense. Defendant was interviewed once more by Investigator Dwight Pearson, who was watching the polygraph examination while seated in another room. Pearson then conducted his own interview of defendant, and defendant, once again, stated that he had shot the victims in self-defense.

However, at trial, rather than claiming self-defense, defendant denied being the shooter and, instead, testified that King, who by this time had been murdered by Gaffney and Dorsey, was the shooter. Defendant, of course, desired to have Gaffney testify on his behalf that King, not defendant, was the shooter. Accordingly, the trial court granted defendant's request to read the prior testimony of Gaffney into the record. Gaffney's prior testimony was read to the jury because Gaffney chose to exercise his Fifth Amendment right against self-incrimination.[8] Gaffney testified that King, not defendant, was the person who shot the victims.

Testifying in his own defense, defendant stated that Gaffney told King to shoot the victims because Gaffney thought that they stole his car. He testified that, after his arrest, he did not want to make a statement, but when Fisher questioned him, defendant knew that Fisher had previously arrested defendant's mother and told defendant that something bad would happen to defendant's mother if defendant did not give a statement. Defendant also testified that Fisher told him that Gaffney was released after he made a statement incul-

---

[8] By the time of defendant's second trial, Gaffney had been convicted of the second-degree murder of King, but he nonetheless asserted his Fifth Amendment right to remain silent regarding the murder of Scott.

pating King. Defendant further told Fisher that King was the shooter. He also testified that he falsely told Fisher that he handed a gun to Gaffney, who handed it to King, because he thought that Fisher would release him upon learning this information. However, instead of releasing defendant, Fisher had defendant interviewed by Sims. Defendant alleged that Sims told him that the only way out would be to confess to shooting the victims and claim self-defense.

During cross-examination, the prosecutor asked defendant about defendant's motivation for implicating King, including defendant's changed version of events, and a statement King gave to the police implicating defendant:

> *Q.* And you had known that before you gave your statement to Investigator Fisher on November twenty-forth [sic] at 3:30 in the afternoon that day, you already knew that Mr. King had ratted you out, isn't that true?
>
> *A.* He ended up telling me that he said that I did it . . . .

Defendant moved for a mistrial and argued that the admission of King's statement, through defendant, violated his Sixth Amendment right to confront witnesses against him. US Const, Am VI and Am XIV. The trial court denied the motion.

## II. STANDARD OF REVIEW

We review de novo a claim of constitutional error. *People v Rodriguez*, 251 Mich App 10, 25; 650 NW2d 96 (2002). However, when a trial court commits an error that denies a defendant his constitutional rights under the Confrontation Clause, US Const, Am VI and Am XIV, we need not reverse if the error is harmless beyond a reasonable doubt. *People v Smith*, 243 Mich App 657,

690; 625 NW2d 46 (2000), citing *People v Carines*, 460 Mich 750, 774; 597 NW2d 130 (1999).

### III. ANALYSIS

### A. APPLICABILITY OF *CRAWFORD v WASHINGTON*

The United States Supreme Court recently held that for testimonial evidence to be admissible against a defendant, the declarant must be unavailable and the defendant must have had "a prior opportunity for cross-examination" of the declarant. *Crawford v Washington*, 541 US 36, ___; 124 S Ct 1354, 1374; 158 L Ed 2d 177, 203 (2004). In so doing, the Court overruled its previous decision in *Ohio v Roberts*, 448 US 56; 100 S Ct 2531; 65 L Ed 2d 597 (1986), which held that such evidence could be admitted if it met certain reliability tests. The Court in *Crawford* expressly rejected the concept that the reliability of an out-of-court statement satisfies the Confrontation Clause, and stated that "[d]ispensing with confrontation because testimony is obviously reliable is akin to dispensing with jury trial because a defendant is obviously guilty. This is not what the *Sixth Amendment* prescribes." *Crawford*, 124 S Ct 1371 (emphasis added).

*Crawford* bars the admission of testimonial, out-of-court statements where the witness is unavailable and the defendant did not have "a prior opportunity for cross-examination" of the declarant. *Crawford*, 124 S Ct 1374. While the Court "[left] for another day any effort to spell out a comprehensive definition of 'testimonial,'" *Crawford*, 124 S Ct 1374, it also stated that "[s]tatements taken by police officers in the course of interrogations are . . . testimonial under even a narrow standard," *Crawford*, 124 S Ct 1364. Therefore, under *Crawford*, King's statement here is undeniably testimonial in nature. Furthermore, because King was dead at

the time of defendant's trial, King is undeniably an "unavailable witness." Moreover, it is undisputed that at no time did defendant have the opportunity to cross-examine King.

In the words of the Court in *Crawford*, "[t]he text of the Sixth Amendment *does not suggest any open-ended exceptions from the confrontation requirement to be developed by the courts." Crawford*, 124 S Ct 1365 (emphasis added).[9] However, the Court also made clear that the Confrontation "Clause . . . does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Crawford*, 124 S Ct 1369 n 9, citing *Tennessee v Street*, 471 US 409, 414; 105 S Ct 2078; 85 L Ed 2d 425 (1985). In *Street*, the defendant testified in his own defense, and claimed that his confession was coerced and derived from an accomplice's testimony. *Street, supra* at 411. The prosecution successfully moved for the admission of the accomplice's testimony at trial. *Id.* The defendant argued that his Confrontation Clause right had been violated because he had not had the opportunity to cross-examine the accomplice. However, the Court held that the accomplice's confession did not violate the Confrontation Clause because it was admissible for the limited purpose of allowing the jury to compare it to the defendant's confession to see whether the defendant's claim that his confession was coerced or derived from the accomplice's testimony was true. *Id.* at 413-414.

Similarly, here, the prosecution argues that evidence of King's statement was not introduced for its sub-

---

[9] The Court explained that "the historical record" suggests "that the Framers would not have allowed admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Id.* at 1365.

stance, but, instead, was introduced to show that defendant was aware of King's statement in light of defendant's testimony that King was the shooter and as part of the prosecutor's theory that defendant changed his story several times and could not be believed. The prosecution says that because the statement was not admitted for its substance (to identify the shooter), it is admissible under *Crawford* and *Crawford's* express adoption of the reasoning in *Street*. We agree with the prosecution. When viewed in light of defendant's testimony as a whole, we conclude that the prosecutor's question was designed to impeach defendant's statement that King was the shooter, particularly in light of defendant's earlier testimony that King had been murdered by Gaffney and Dorsey because of a dispute over money and because King was looking to "rat people out" in court. When defendant volunteered testimony that King had planned to "rat people out," defendant opened the door to questioning by the prosecutor that King had "ratted out" defendant. Further, defendant changed his version of the facts numerous times and the prosecution cross-examined defendant to show his lack of credibility, and King's statement was simply one more element that undermined defendant's credibility. Moreover, though certainly not dispositive on the issue of the applicability of *Crawford*, we note that the prosecution never mentioned or used King's statement during its closing argument for the purpose of identifying defendant as the shooter. To the contrary, in closing, the prosecution relied exclusively on Meadows's eyewitness testimony that identified defendant as a person who shot the victims and on defendant's inculpatory statements to the police that he shot the victims, albeit in self-defense. As a result of the foregoing, we hold that the introduction of King's statement through defendant did not violate the Confrontation Clause and, therefore,

the trial court did not err when it admitted this state-
ment.[10]

Additionally, defendant challenges the admissibility
of his statements to police investigators on the ground
that the statements violated his Fifth and Sixth Amend-
ment rights to counsel. Defendant also argues that
evidence of his statements to Investigator Sims and
Investigator Pearson should have been excluded on the
ground that they were involuntary.

We find no merit to defendant's claim that his Sixth
Amendment right to counsel was violated because de-

---

[10] Were we to hold, under *Crawford*, that the trial court erred in
admitting King's statement, which we do not, we would nevertheless hold
that the error was harmless beyond a reasonable doubt in light of
Meadows's unequivocal identification of defendant as one of the victims'
shooters and in light of defendant's own inculpatory statements. Again,
were we to hold that *Crawford* applies to these facts, we would also find
that the decision applies retrospectively because " 'a new rule for the
conduct of criminal prosecutions is to be applied retroactively to all cases,
state or federal, pending on direct review or not yet final.' " *Powell v
Nevada*, 511 US 79, 84; 114 S Ct 1280; 128 L Ed 2d 1 (1994), quoting
*Griffith v Kentucky*, 479 US 314, 328; 107 S Ct 708; 93 L Ed 2d 649
(1987). We note also that our Supreme Court has vacated and remanded
at least two opinions of this Court for reconsideration of Confrontation
Clause claims in light of *Crawford*. *People v Bell (On Remand)*, unpub-
lished opinion per curiam of the Court of Appeals, issued February 5,
2002 (Docket Nos. 209269, 209270), vacated and remanded 470 Mich 875
(2004); *People v Brown*, unpublished opinion per curiam of the Court of
Appeals, issued September 9, 2003 (Docket No. 237027), vacated and
remanded 470 Mich 851 (2004). Finally, were we to hold that *Crawford*
applies, we would also hold that *Crawford* overrules *sub silentio People v
Schutte*, 240 Mich App 713; 613 NW2d 370 (2000), because *Schutte* relies
on our Supreme Court's decision in *People v Poole*, 444 Mich 151,
162-163; 506 NW2d 505 (1993), which, in turn, relies on *Roberts, supra* at
66. The Court in *Crawford* expressly overruled *Roberts*, and specifically
cited *Schutte* as an example of a court that allowed the admission of
statements under *Roberts*. *Crawford*, 124 S Ct 1371.

fendant does not identify any adversarial judicial proceeding against him before his statements were given. The Sixth Amendment right to counsel does not attach until adversarial judicial proceedings are initiated against a defendant. *People v Anderson (After Remand)*, 446 Mich 392, 402; 521 NW2d 538 (1994); *People v Williams*, 244 Mich App 533, 538-539; 624 NW2d 575 (2001). The failure to brief the merits of an allegation of error constitutes an abandonment of the issue. *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998); *People v Kent*, 194 Mich App 206, 210; 486 NW2d 110 (1992).

Whether defendant's Fifth Amendment right to counsel was violated, *Edwards v Arizona*, 451 US 477; 101 S Ct 1880; 68 L Ed 2d 378 (1981), and whether defendant's statements to Sims and Pearson were voluntary turned principally on credibility issues, which were resolved against defendant. Giving deference to the trial court's superior position to evaluate the credibility of the witnesses, defendant has not established that his Fifth Amendment right to counsel was violated. *People v Farrow*, 461 Mich 202, 209; 600 NW2d 634 (1999); *People v Adams*, 245 Mich App 226, 235; 627 NW2d 623 (2001).

Also, we have independently reviewed the record and again giving due deference to the trial court's findings, we find no basis for disturbing the court's decision that defendant's statements were voluntary. *People v Shipley*, 256 Mich App 367, 372; 662 NW2d 856 (2003). The delay between defendant's initial arrest for an unrelated matter on November 22, 2000, and his statements to Sims and Pearson on November 26, 2000, is a relevant factor in determining whether the statements were voluntary, but the principal focus is not on the mere passage of time, but on the effect of the delay

on defendant. *People v Cipriano*, 431 Mich 315, 334-335; 429 NW2d 781 (1988). The evidence at the suppression hearing supports the trial court's findings that defendant knew what he was doing when he signed the advice-of-rights forms and that, in light of the statements provided by Gaffney and King, defendant agreed to be taken for a polygraph examination and stated that he wanted to clear his name. Moreover, the delay between defendant's consent for the polygraph examination and the resulting examination was because Sims, the polygraph examiner, was not available until two days after Fisher's questioning of defendant. Defendant's statement to Sims occurred at the polygraph examination under circumstances in which defendant was told that he was untruthful. Defendant's statement to Pearson was made after the statements to Sims and contained the same admissions. The totality of the circumstances surrounding both statements indicates that they were made voluntarily. *People v Daoud*, 462 Mich 621, 635; 614 NW2d 152 (2000); *Cipriano, supra*; *People v Emanuel*, 98 Mich App 163, 182; 295 NW2d 875 (1980).

## C. LIMITATION OF CROSS-EXAMINATION

Defendant claims erroneously that he was denied his Sixth Amendment right of confrontation when the trial court limited his cross-examination of Meadows at trial. Defendant failed to preserve this claim of error because he did not specifically object at trial on this ground nor did he make an adequate offer of proof that identified what relevant evidence he was unable to present or what issues he was unable to adequately explore because of the trial court's limitation. *People v Hackett*, 421 Mich 338, 354; 365 NW2d 120 (1984); *People v Considine*, 196 Mich App 160, 162; 492 NW2d 465

(1992). Defense counsel's mere statement that the trial court's ruling would substantially limit his intended cross-examination was insufficient to properly preserve this claim for appeal. Accordingly, our review of this issue is limited to whether defendant has shown a plain error affecting his substantial rights. *Carines, supra* at 763.

We find no support for defendant's claim that the trial court limited his cross-examination solely because the witness was nervous. Quite apart from considering the distraught condition of the witness, the trial court correctly observed that defense counsel asked numerous questions on the same points. The trial court did not preclude defendant from placing before the jury any facts from which bias, prejudice, or lack of credibility might be inferred. *People v Cunningham*, 215 Mich App 652, 657; 546 NW2d 715 (1996); *People v Mumford*, 183 Mich App 149, 153; 455 NW2d 51 (1990). Because defendant has not shown that he was denied a reasonable opportunity to test the truthfulness of Meadows's testimony on any material issue, we conclude that he has not shown plain error. *Hackett, supra* at 344; *People v Adamski*, 198 Mich App 133, 139; 497 NW2d 546 (1993).

### D. ALLEGED UNRESPONSIVE WITNESS TESTIMONY

Defendant also maintains that reversal is required because Sims[11] gave unresponsive testimony, on cross-examination by defense counsel, that denied him a fair trial. We conclude that defendant waived his right to seek appellate review of Sims's response because defendant sought opinion testimony from Sims about inter-

---

[11] Although defendant's argument refers to Sims as the polygraph examiner, this fact was not disclosed to the jury. Rather, Sims was referred to at trial as an interview specialist.

view techniques. The potential that Sims could provide an opinion harmful to the defense was affirmatively waived by defense counsel's conduct. *People v Riley*, 465 Mich 442, 448; 636 NW2d 514 (2001). Under the doctrine of invited error, a party waives the right to seek appellate review when the party's own conduct directly causes the error. *People v Jones*, 468 Mich 345, 352; 662 NW2d 376 (2003). Here, where defendant clearly waives this issue by inviting the alleged error and fails to object, he has lost his right to assert this issue on appeal. See *People v Carter*, 462 Mich 206, 215-216; 612 NW2d 144 (2000).[12]

### E. ALLEGED PROSECUTORIAL MISCONDUCT

Defendant asserts that the prosecutor's remark during rebuttal argument that King had been shot in the head and his body dumped in Hamtramck deprived him of a fair trial because the remark lacked evidentiary support. We disagree. Although the prosecutor's remark was not supported by the evidence,[13] the jury heard testimony about Gaffney being charged with King's murder. Furthermore, defendant himself testified about this fact, that he initially implicated Gaffney in King's murder, and that Gaffney was tried for the

---

[12] We reject defendant's alternative claim that defense counsel was ineffective for failing to object to Sims's testimony. Limiting our review to error apparent from the record, defendant has not overcome the presumption that counsel failed to object as a matter of trial strategy. *People v Toma*, 462 Mich 281, 302-303; 613 NW2d 694 (2000); *People v Avant*, 235 Mich App 499, 507; 597 NW2d 864 (1999).

[13] However, it is undisputed that King was murdered, that Gaffney and Dorsey were convicted of second-degree murder, and that defendant had, indeed, testified that defendant earlier implicated Gaffney in the murder of King. Though Gaffney and Dorsey had been convicted of second-degree murder before defendant's second trial, the fact of this conviction had not been presented to the jury.

murder of King. Moreover, as the trial court observed when addressing defendant's motion for a mistrial, defendant did not timely object to the prosecutor's remark. Under the circumstances, the trial court's jury instruction that "[t]he lawyers' statements or arguments, they are not evidence" was sufficient to dispel any prejudice. Therefore, this unpreserved issue does not warrant appellate relief. *Schutte, supra* at 720-722.

Affirmed.