*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

THOMAS SWIDER,

        Defendant-Appellant.

UNPUBLISHED
November 21, 2023

No. 363450
Macomb Circuit Court
LC No. 2021-002138-FC

Before: RIORDAN, P.J., and CAVANAGH and GARRETT, JJ.

PER CURIAM.

Defendant Thomas Swider repeatedly sexually abused his granddaughter and her friend over several summers. A jury convicted Swider of five counts of first-degree criminal sexual conduct (CSC-I), MCL 750.520b(1)(a) and (2)(b), and two counts of second-degree criminal sexual conduct (CSC-II), MCL 750.520c(1)(a) and (2)(b). For his CSC-I convictions, the trial court imposed the statutorily-required minimum sentence of 25 years' imprisonment. On appeal, Swider raises evidentiary challenges, objects to the constitutionality of his mandatory minimum sentence, and, in a Standard 4 brief, presents a litany of other arguments. Finding no errors warranting reversal, we affirm.

## I. BACKGROUND

This case arose from allegations that Swider inflicted frequent sexual abuse on his granddaughter, DS, and her childhood friend, EW, during the summers of 2013 to 2015. The complainants were around five to eight years old, and in first to third grade, when the abuse occurred. Swider lived in Arizona at the time, but he visited and stayed with DS and her family in Michigan over the summers. EW was DS's best friend, and she came over to DS's house almost every day during the summer. Among several allegations of abuse, the complainants testified that Swider sexually penetrated one or both of them with his mouth, finger, penis, and an object, and that he touched their breasts. DS and EW were often in the room together when the abuse took place. Swider told DS not to disclose the abuse because that would break Swider's rule to "never betray" him.

When the abuse occurred, DS and EW never talked to each other about it. The complainants drifted apart after third grade, but they sometimes checked in on one another and first spoke about the abuse in eighth grade. In June 2020, DS disclosed the abuse to her mother's close friend, who DS called her aunt, and then DS told her mother. Afterward, DS's mother told Swider, who had been making plans to visit the family, not to come. Swider asked if the reason for the change in plans was because of something he said; DS's mother told him it was because of something DS and EW said. Over the next several months, Swider sent peculiar birthday cards to DS and her family. In a birthday card to DS's mother, Swider wrote:

> I don't know what they told you. Some of it might be true, none of it might be true, or all of it might be true. It doesn't matter. The only thing that mattered was your reaction.

In another birthday card addressed to DS, Swider reminded DS of his rules:

> Rule number one, I will love you always regardless. Rule number two, I will never betray you like snitching. Rule number three, I will never lie to you.

And in a birthday card to DS's sister, Swider wrote that "[DS] and [EW] threw me under the bus."

The jury found Swider guilty on all counts. The five CSC-I convictions consisted of two counts involving EW for sexual penetration by Swider using his finger and penis, and three counts involving DS for sexual penetration by Swider using his mouth/tongue, finger, and an object. The two CSC-II convictions consisted of one count each for intentionally touching EW and DS on their breasts or the clothing covering that area. As noted, for the CSC-I convictions, the trial court imposed the mandatory minimum sentence of 25 years' imprisonment required under MCL 750.520b(2)(b).

Swider now appeals as of right.

## II. BRIEF FILED BY APPELLATE COUNSEL

In a brief filed by Swider's appellate counsel, Swider makes four arguments: (1) the trial court erroneously admitted hearsay testimony under MRE 803A, (2) the prosecutor committed misconduct by asking a leading question of DS, (3) the 25-year mandatory minimum sentence constitutes cruel and/or unusual punishment, and (4) the sentence also violates the separation of powers by impermissibly limiting the trial court's sentencing discretion.

### A. PRESERVATION AND STANDARD OF REVIEW

Swider preserved his hearsay argument by objecting at trial on the same grounds raised on appeal. See *People v Thorpe*, 504 Mich 230, 252; 934 NW2d 693 (2019). We review a preserved challenge to a trial court's evidentiary ruling for an abuse of discretion. *Id*. at 251-252. That means the trial court's decision will be disturbed only if it fell outside the range of principled outcomes. *Id*. "To the extent that the trial court's evidentiary decision involves underlying questions of law, such as whether a statute precludes admissibility of evidence, this Court reviews those questions of law de novo." *People v Sharpe*, 502 Mich 313, 324; 918 NW2d 504 (2018).

De novo review means that we review the legal issue independently and without deference to the trial court. *People v Beck*, 504 Mich 605, 618; 939 NW2d 213 (2019). Swider's remaining arguments about prosecutorial misconduct and the constitutionality of his sentence were never raised to the trial court. These claims are therefore unpreserved and reviewed for plain error. See *People v Pipes*, 475 Mich 267, 277-278; 715 NW2d 290 (2006).

> To establish entitlement to relief under plain-error review, the defendant must establish that an error occurred, that the error was plain, i.e., clear or obvious, and that the plain error affected substantial rights. The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings. Finally, even if a defendant satisfies those three requirements, an appellate court must exercise its discretion in deciding whether to reverse. Reversal is warranted only when the error resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity, or public reputation of judicial proceedings independently of the defendant's innocence. [*People v Lockridge*, 498 Mich 358, 392-393; 870 NW2d 502 (2015).].

## B. HEARSAY

Turning to the merits, Swider first argues that the trial court erroneously admitted hearsay testimony by DS about her initial disclosure of sexual abuse.

Hearsay is a "statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c). See also *People v Stamper*, 480 Mich 1, 3; 742 NW2d 607 (2007) ("Hearsay is an unsworn, out-of-court statement that is offered to establish the truth of the matter asserted."). The declarant is the person who makes the statement. MRE 801(b). Hearsay is generally inadmissible, unless an enumerated exception applies. MRE 802. One such exception in child sexual abuse cases, MRE 803A, provides in relevant part:

> A statement describing an incident that included a sexual act performed with or on the declarant by the defendant or an accomplice is admissible to the extent that it corroborates testimony given by the declarant during the same proceeding, provided:
>
> (1) the declarant was under the age of ten when the statement was made;
>
> (2) the statement is shown to have been spontaneous and without indication of manufacture;
>
> (3) either the declarant made the statement immediately after the incident or any delay is excusable as having been caused by fear or other equally effective circumstance; and
>
> (4) the statement is introduced through the testimony of someone other than the declarant.

MRE 803A codified the common-law tender years exception, a rule that "allow[s] hearsay in order to corroborate the testimony of a child complainant." *People v Gursky*, 486 Mich 596, 607, 607 n 20; 786 NW2d 579 (2010).

During DS's testimony, the prosecutor asked her whether she remembered telling her aunt "something about [her] grandpa." After DS replied that she did, the prosecutor eventually asked, "What did you tell [your aunt] about the Defendant?" Swider objected on hearsay grounds, and the prosecutor responded, "It's just what she said." The trial court overruled the objection:

> It is hearsay, but under these circumstances, the first initial disclosure can be repeated, and I'm sure is going to be repeated, so subject to that and the consistency associated with that disclosure, the Court's going to permit it.
>
> Hearsay is an out of court statement generally made by a third person, it can be by the person testifying being admitted for the truth of the matter asserted. There's volumes of exceptions associated with that rule. Under these circumstances, because it is the initial disclosure and because we are going to have testimony relative to it later and she is the person who made it, the Court is going to permit it.

DS then testified about her disclosure to her aunt:

> . . . I just told her that I had to talk, and I told her that I was probably going to cry, so she took me in her car and I told her when I was younger that when my grandpa was in town that stuff – he would do stuff to me, and by me saying that she already kind of knew what I was talking about.

As an initial matter, the trial court appeared to rely on MRE 803A's hearsay exception to admit DS's testimony when it emphasized that the statement was her "initial disclosure." If so, the trial court erred in its application of MRE 803A. The conditions for admissibility under MRE 803A were not met here. Among other things, MRE 803A only applies when "the statement is introduced through the testimony of someone other than the declarant," MRE 803A(4), and when "the declarant was under the age of ten when the statement was made," MRE 803A(1). The statement at issue was introduced through the declarant's testimony, and DS was 13 years old when she made the out-of-court statement. Thus, the statement plainly failed the test for admissibility under MRE 803A.

Even so, the prosecution asserts that DS's testimony about her disclosure was not hearsay because she was merely "testifying from her own knowledge of what *she did and said*," and therefore no exception to the rules was required for its admission. On first glance, the prosecution's position presents some logical appeal—the rules of evidence exclude statements "made by the declarant while testifying at the trial" from the definition of hearsay. MRE 801(c). But what MRE 801(c) intends when it excludes statements "made by the declarant while testifying at the trial" from the definition of hearsay is to clarify that not all *in-court statements* made at trial to prove the truth of the matter asserted are themselves hearsay. When a declarant testifies to her own prior *out-of-court statement*, however, and that statement is offered for the truth of the matter asserted, the statement may still constitute inadmissible hearsay.

If a declarant could testify to any out-of-court statement that she made without implicating the rule against hearsay, then other rules of evidence would be rendered superfluous. "When construing court rules, including evidentiary rules, this Court applies the same principles applicable to the construction of statutes." *People v Duncan*, 494 Mich 713, 723; 835 NW2d 399 (2013). These principles include avoiding an interpretation that would render any part of the rule surplusage or nugatory. *People v Kloosterman*, 296 Mich App 636, 639-640; 823 NW2d 134 (2012). MRE 801(d)(1) provides that certain prior statements of a declarant-witness are not hearsay when the declarant testifies at trial, is subject to cross-examination, and certain enumerated conditions are met.[1] Thus, when MRE 801(c) provides that statements "made by the declarant while testifying at the trial" are not hearsay, that necessarily cannot include any testimony describing the declarant's own prior *out-of-court statements*. As MRE 801(d)(1) makes clear, the rules of evidence limit when a declarant's prior statements are admissible. Thus, when a declarant's testimony is merely an in-court recitation of the declarant's out-of-court statement, and MRE 801(d)(1) does not apply, the statement constitutes hearsay when offered in evidence for the truth of the matter asserted.

In this case, DS's testimony about her disclosure to her aunt was merely a recitation of her own prior out-of-court statement. Although euphemistic in content, the statement that Swider "would do stuff to me" was evidence offered for the truth of the matter asserted—that Swider sexually abused DS. Accordingly, the statement constituted inadmissible hearsay.

In any event, the erroneous admission of this testimony does not entitle Swider to relief because it was harmless. "[A] preserved, nonconstitutional error is not a ground for reversal unless 'after an examination of the entire cause, it shall affirmatively appear' that it is more probable than not that the error was outcome determinative." *People v Lukity*, 460 Mich 484, 496; 596 NW2d 607 (1999), quoting MCL 769.26. This prejudice inquiry "focuses on the nature of the error and assesses its effect in light of the weight and strength of the untainted evidence." *Gursky*, 486 Mich at 620 (quotation marks and citation omitted). "[T]he admission of a hearsay statement that is cumulative to in-court testimony by the declarant can be harmless error, particularly when corroborated by other evidence." *Id*.

DS's statement that Swider "would do stuff to me" was vague and did not bolster the more specific allegations of abuse by the complainants. At most, the statement was cumulative to DS's extensive testimony about the repeated sexual acts perpetrated by Swider against her. See *id*. See also *People v Rodriguez*, 216 Mich App 329, 332; 549 NW2d 359 (1996) (holding that admission

---

[1] In full, MRE 801(d)(1) provides that a statement is not hearsay if

(1) *Prior statement of witness*. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with the declarant's testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition, or (B) consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive, or (C) one of identification of a person made after perceiving the person[.]

of hearsay evidence was harmless when it merely "reiterated the complainant's testimony that she had been abused"). EW also testified about "[c]ountless" instances of abuse committed by Swider. Together, the complainants' testimony, subject to cross-examination, minimized any prejudicial effect that admission of the hearsay statement had on Swider. See *Gursky*, 486 Mich at 621 ("Where the declarant himself testifies and is subject to cross-examination, the hearsay testimony is of less importance and less prejudicial."). Nor did this case involve the type of "one-on-one credibility contest between the victim and the defendant" in which "hearsay evidence may tip the scales against the defendant." *Id*. at 620-621. DS and EW provided highly corroborating accounts of the other person's victimization—including both testifying that they were in the same room during some of the abuse. The prosecution also presented evidence of suspicious cards sent by Swider to DS and her family after she disclosed her allegations of abuse, including one card sent to DS that reminded her of his rule against snitching. For these reasons, the erroneous admission of hearsay was not outcome determinative and does not entitle Swider to relief.

## C. PROSECUTORIAL MISCONDUCT

Swider next contends that the prosecutor committed misconduct by asking an improper leading question of DS.

A leading question is one that "suggests the answer to the person" being questioned and can often be answered with a simple "yes" or "no." *Black's Law Dictionary* (11th ed). While leading questions are disfavored on direct examination, they are not categorically barred. See MRE 611(d) ("Leading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony."). That said, "a prosecutor has considerable leeway to ask leading questions to child witnesses." *People v Johnson*, 315 Mich App 163, 199; 889 NW2d 513 (2016). "In order to demonstrate that reversal is warranted for the prosecution asking leading questions, it is necessary to show some prejudice or patterns of eliciting inadmissible testimony." *Id*. at 200 (quotation marks and citation omitted).

Before the prosecutor asked the question at issue, DS had testified that Swider licked her vagina several times. After detailing these allegations, the prosecutor asked, "[W]ere there any other times when he touched you?" DS responded that there were; she testified that Swider "would touch [her] with his hands, and this blue vibrating toy." The prosecutor asked other questions about Swider's use of his hands and established the location of these acts, which led to the following exchange:

> *Q*. . . . [H]ow did he get to a point where he was putting his fingers in your vagina?
>
> *A*. I don't really remember that part.
>
> *Q*. Okay. But at some point, he would be in the basement?
>
> *A*. Yes.
>
> *Q*. And then how would this happen? How would it come about that you were on this couch, and he would start doing this to you?

*A.* So, the table – it was the table and the couch right there, so I'd be sitting on the couch, and the table would be right there with the makeup, and he would pretty much just start either touching my vagina or he would start touching my breasts.

The prosecutor then showed a photograph to DS, which she identified as a vagina. The exchange continued:

*Q.* Okay. Are you able to tell the members of the jury where he touched you?

*A.* He would touch me by my clitoris.

*Q.* Okay. Was it inside the hole or outside the hole? Well, what did—go ahead.

*A.* It was inside.

On appeal, Swider takes issue both with the prosecutor's question— "how did he get to a point where he was putting his fingers in your vagina"—and with DS being "prompted" with a diagram of a vagina to testify to acts of penetration. First, the question at issue was not leading. It did not suggest or imply an answer; it was an open-ended question about the events leading up to Swider's acts of digital penetration. Even assuming that this was a leading question, and an improper one at that, Swider has not established prejudice or shown that the prosecution engaged in "patterns of eliciting inadmissible testimony." *Johnson*, 315 Mich App at 200 (quotation marks and citation omitted). While the prosecutor's question may have gotten slightly ahead of the evidence—DS had not yet testified that Swider put his fingers *inside* her vagina—Swider cannot establish that this single question prejudiced him.[2] DS testified in specific terms to Swider's digital penetration of her, noting that he touched her inside by her clitoris. The trial court also instructed the jury that the lawyers' questions were not evidence and should be considered only to the extent that they gave meaning to the witnesses' answers. Jurors are presumed to follow the trial court's instructions. *People v Zitka*, 335 Mich App 324, 348; 966 NW2d 786 (2020). Simply put, Swider has established no error that entitles him to relief.

As for the claim that the prosecutor "prompted" DS to testify to penetrative acts by directing her to a diagram of a vagina, Swider's interpretation of events is belied by the record. When DS testified that she "[didn't] really remember that part," she was responding to a question about events *leading up* to Swider digitally penetrating her; she never stated that she did not remember the digital penetration actually occurring. Then, after DS testified that Swider touched her vagina, the prosecutor presented DS with a proposed exhibit, which she identified as a photograph of a vagina. In response to non-leading questions, DS testified that Swider touched her by her clitoris, and she pointed to the area on the diagram where Swider touched her. The

---

[2] A better argument could have been made that the question improperly assumed facts about digital penetration that were not in evidence. Swider has not made this argument and has framed the issue solely as one about a leading question.

diagram was then admitted, without objection, into evidence. In sum, DS independently testified to the location of Swider's digital penetration, and the diagram was used as a demonstrative tool to help the jury understand her testimony. See *People v Bulmer*, 256 Mich App 33, 35; 662 NW2d 117 (2003) ("Demonstrative evidence is admissible when it aids the fact-finder in reaching a conclusion on a matter that is material to the case."). Swider has established no error related to the use of the diagram during DS's testimony.

## D. CRUEL AND/OR UNUSUAL PUNISHMENT

Swider next argues that his mandatory minimum 25-year sentence constitutes cruel and/or unusual punishment under the United States and Michigan Constitutions.

The United States Constitution prohibits "cruel and unusual" punishment, US Const Am VIII, while the Michigan Constitution prohibits "cruel or unusual" punishment, Const 1963, art 1, § 16. Our Supreme Court has long held that the state constitutional prohibition on "cruel or unusual" punishment provides greater protection than its federal counterpart. See *People v Stovall*, 510 Mich 301, 313-314; 987 NW2d 85 (2022), citing *People v Bullock*, 440 Mich 15, 30-35; 485 NW2d 866 (1992). Thus, if a punishment "passes muster under the state constitution, then it necessarily passes muster under the federal constitution." *People v Nunez*, 242 Mich App 610, 618 n 2; 619 NW2d 550 (2000). To determine whether a particular sentence is cruel or unusual, Michigan courts consider four factors: "(1) the harshness of the penalty compared to the gravity of the offense, (2) the penalty imposed for the offense compared to penalties imposed for other offenses in Michigan, (3) the penalty imposed for the offense in Michigan compared to the penalty imposed for the same offense in other states, and (4) whether the penalty imposed advances the goal of rehabilitation." *People v Lymon*, 342 Mich App 46, 82; 993 NW2d 24 (2022), app gtd 983 NW2d 82 (Mich, 2023), citing *Bullock*, 440 Mich at 33-34.

MCL 750.520b(2)(b) provides that when the offense of CSC-I "is committed by an individual 17 years of age or older against an individual less than 13 years of age," the penalty is "imprisonment for life or any term of years, but not less than 25 years." Thus, there is no dispute that the 25-year mandatory minimum sentence applied to Swider's CSC-I convictions. In *People v Benton*, 294 Mich App 191, 203; 817 NW2d 599 (2011), this Court considered whether the 25-year mandatory minimum sentence under MCL 750.520b(2)(b) was an unconstitutionally cruel and/or unusual punishment under the federal and state constitutions. After considering the factors from *Bullock*, this Court concluded that this mandatory minimum sentence was not unconstitutionally cruel or unusual. *Benton*, 294 Mich App at 203-207. Among other things, this Court noted that "[t]he perpetration of sexual activity by an adult with a preteen victim is an offense that violates deeply ingrained social values of protecting children from sexual exploitation." *Id*. at 206. As Swider acknowledges, *Benton* has not been reversed or modified by our Supreme Court, so we are bound to follow it. See MCR 7.215(J)(1) ("A panel of the Court of Appeals must follow the rule of law established by a prior published decision of the Court of Appeals issued on or after November 1, 1990, that has not been reversed or modified by the Supreme Court, or by a special

panel of the Court of Appeals as provided in this rule."). Accordingly, Swider's argument that MCL 750.520b(2)(b) constitutes cruel and/or unusual punishment lacks merit.[3]

## E.  SEPARATION OF POWERS

Swider also argues that MCL 750.520b(2)(b) violates the separation-of-powers doctrine because it impermissibly limits the trial court's sentencing discretion.

Article 3, Section II of the Michigan Constitution provides for the separation of powers:

> The powers of government are divided into three branches: legislative, executive and judicial. No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution.

As part of the constitutionally enumerated legislative powers, "[t]he legislature may provide for indeterminate sentences as punishment for crime and for the detention and release of persons imprisoned or detained under such sentences." Const 1963, art 4, § 45. Thus, "the ultimate authority to provide for penalties for criminal offenses is constitutionally vested in the Legislature," whereas "[t]he authority to impose sentences and to administer the sentencing statutes enacted by the Legislature lies with the judiciary." *People v Hegwood*, 465 Mich 432, 436-437; 636 NW2d 127 (2001). Consistent with this authority, the Legislature has enumerated "offenses with regard to which the judiciary has no sentencing discretion, offenses about which discretion is sharply limited, and offenses regarding which discretion may be exercised under the terms set forth in the sentencing guidelines legislation." *People v Garza*, 469 Mich 431, 434; 670 NW2d 662 (2003) (citations omitted).

In *People v Murray*, 341 Mich App 205, 216; 989 NW2d 284 (2022) (*Murray I*), vacated in part on other grounds by 979 NW2d 670 (Mich, 2022) (*Murray II*), this Court rejected the argument that MCL 750.520b(2)(b) "deprives a sentencing court of its discretion to consider individualized, mitigating circumstances by mandating a sentence of not less than 25 years." This Court held that the statute "represents a permissible exercise of legislative authority to prescribe a

---

[3] To the extent that Swider raises an as-applied challenge to his sentence rather than a facial challenge, his argument remains meritless. A facial challenge involves a claim that "there is no set of circumstances under which the enactment is constitutionally valid," *People v Wilder*, 307 Mich App 546, 556; 861 NW2d 645 (2014), while an as-applied challenge "considers the specific application of a facially valid law to individual facts," *Promote the Vote v Secretary of State*, 333 Mich App 93, 117; 958 NW2d 861 (2020) (quotation marks and citation omitted). Swider has failed to explain why a 25-year mandatory minimum sentence is unconstitutionally cruel or unusual as applied to his circumstances. His brief merely states that the sentencing guidelines encourage individualized sentencing and that his sentence for the CSC-I convictions, "considering all the applicable sentencing guidelines variables, should have been no more than 15 years." As the party with the burden to prove the unconstitutionality of the sentencing statute, *People v Sadows*, 283 Mich App 65, 79; 768 NW2d 2d 93 (2009), Swider has fallen well short.

mandatory minimum sentence" in accordance with Article 4, § 45 of the Michigan Constitution. *Murray I*, 341 Mich App at 216. Our Supreme Court vacated Murray in part on an unrelated ground and denied leave to appeal in all other respects. *Murray II*, 979 NW2d at 670-671. Thus, *Murray*'s independent holding that MCL 750.520b(2)(b) does not contravene the separation of powers remains binding precedent and requires us to reject Swider's argument. See MCR 7.215(J)(1).

## III. STANDARD 4 BRIEF

Swider raises a wide range of arguments in his Standard 4 brief, "a brief filed by the defendant *in propria persona* in which he or she raises issues on appeal against the advice of counsel." *People v Ryan*, 295 Mich App 388, 392 n 1; 819 NW2d 55 (2012).

## A. PRESERVATION AND STANDARD OF REVIEW

We note at the outset, as we will discuss further, that Swider has abandoned most of the arguments in his Standard 4 brief. Swider provides sparse analysis, and little to no legal support, for many positions. See *People v McPherson*, 263 Mich App 124, 136; 687 NW2d 370 (2004) ("The failure to brief the merits of an allegation of error constitutes an abandonment of the issue."). See also *People v Iannucci*, 314 Mich App 542, 545; 887 NW2d 817 (2016) ("An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment with little or no citation of supporting authority.") (quotation marks and citation omitted). Nor did Swider properly preserve any of the arguments raised in his Standard 4 brief. Our review is therefore limited to plain error affecting substantial rights. *Pipes*, 475 Mich at 278.

## B. RIGHT TO REPRODUCTIVE FREEDOM

Swider first argues that his CSC-I convictions violate Article I, § 28(1) of the Michigan Constitution. That provision, added to the Michigan Constitution following the November 2022 elections, provides in relevant part:

> (1) Every individual has a fundamental right to reproductive freedom, which entails the right to make and effectuate decisions about all matters relating to pregnancy, including but not limited to prenatal care, childbirth, postpartum care, contraception, sterilization, abortion care, miscarriage management, and infertility care.

> An individual's right to reproductive freedom shall not be denied, burdened, nor infringed upon unless justified by a compelling state interest achieved by the least restrictive means. [Const 1963, Art 1, § 28.]

Swider contends that "MCL 750.520b is a law against nature" and muses that "[o]bjectionable assault determined by the individual and not the state is a guarantee of sexual autonomy." Swider appears to be suggesting that MCL 750.520b impermissibly criminalizes sexual activity and that child sexual abuse is somehow encompassed within the "fundamental right to reproductive freedom." Const 1963, Art 1, § 28. That argument is disturbing and nonsensical.

Unsurprisingly, Swider has provided no legal or factual support for the argument that MCL 750.520b violates the Michigan Constitution's protections for reproductive freedom. This argument is meritless and abandoned. See *McPherson*, 263 Mich App at 136.

## C. ESTABLISHMENT CLAUSE

Undeterred, Swider perplexingly argues that MCL 750.520b constitutes an establishment of religion prohibited by the First Amendment of the United States Constitution. Among other things, the First Amendment provides that "Congress shall make no law respecting an establishment of religion . . . ." US Const, Am I. Known as the Establishment Clause, this provision prohibits the government from engaging in impermissible religious coercion. See *Kennedy v Bremerton Sch Dist*, ___ US ___; 142 S Ct 2407, 2429; 213 L Ed 2d 755 (2022). Swider again offers no legal or factual support for his Establishment Clause argument, beyond bizarrely suggesting that the criminalization of child sexual abuse is merely "religion in disguise." This argument is abandoned. See *McPherson*, 263 Mich App at 136.

## D. VAGUENESS

Next, Swider contends that MCL 750.520b is unconstitutionally vague. "A statute may be unconstitutionally vague on any of three grounds: (1) it is overbroad, impinging on First Amendment freedoms, (2) it fails to provide fair notice of the conduct proscribed, or (3) it is so indefinite that it confers unlimited and unstructured discretion on the trier of fact to determine whether an offense has occurred." *People v Hrlic*, 277 Mich App 260, 263; 744 NW2d 221 (2007). Swider fails to explain why MCL 750.520b is unconstitutionally vague. Instead, he simply seems to disagree with the statutory definition of "sexual penetration" that supports his CSC-I convictions.

Swider was convicted of CSC-I under MCL 750.520b(1)(a), which punishes "engag[ing] in sexual penetration with another person" when "[t]hat other person is under 13 years of age." The Legislature has defined "[s]exual penetration" to mean "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of another person's body . . . ." MCL 750.520a(r). Swider complains of the inclusion of cunnilingus and fellatio in the statutory definition of sexual penetration. But "[w]hen the statutory language is plain and unambiguous, the Legislature's intent is clearly expressed, and judicial construction is neither permitted nor required." *People v Costner*, 309 Mich App 220, 224; 870 NW2d 582 (2015). Logically then, "[i]f a statute specifically defines a term, the statutory definition is controlling." *Id*. at 225. The Legislature decided that cunnilingus and fellatio constitute "sexual penetration" for purposes of MCL 750.520b(1)(a). Swider may disagree with this definition but that disagreement provides no basis for concluding that the statute is unconstitutionally vague.

Swider suggests that someone might unknowingly violate MCL 750.520b because of differences between the statutory definition of "sexual penetration" and its common understanding. But the relevant question for this vagueness argument is whether the statutory language provides "fair notice" of the prohibited conduct. See *Hrlic*, 277 Mich App at 263. Swider does not dispute that MCL 750.520b provides fair notice that cunnilingus, which formed the basis

for one of his CSC-I convictions, constitutes sexual penetration. Indeed, by defining sexual penetration as it did, the Legislature could not have been clearer that sexual penetration includes cunnilingus. Swider is simply asking us to rewrite the statute, which we lack the authority to do. See *People v Harris*, 499 Mich 332, 356; 885 NW2d 832 (2016) ("It is not our role to rewrite the law or substitute our own policy judgment in the face of the text of the statute . . . .").

Swider also questions the definition of penetration given by the trial court in its final instructions to the jury. Relying on *People v Lockett*, 295 Mich App 165, 188; 814 NW2d 295 (2012), the trial court instructed the jury that penetration meant

> sexual intercourse, cunnilingus or any other intrusion, however slight, of any part of any person's body or any object into the genital or anal openings, and *includes any intrusion, however slight, into the vagina or labia majora*. [Emphasis added.]

The trial court gave this added instruction about the vagina and labia majora, per the prosecution's request, to provide greater detail on what constituted an intrusion into the "genital opening." Swider offers no legal argument disputing the inclusion of this instruction, other than to state that it showed how the prosecution sought to confuse the jury. If anything, the trial court's decision to include this more specific definition was an attempt to avoid any confusion among the jury as to what the prosecution had to prove to satisfy the element of sexual penetration. Again, Swider has not established that MCL 750.520b is unconstitutionally vague.

### E. JURY SELECTION, DELIBERATION, AND IMPARTIALITY

Swider raises a litany of claims related to the jury. First, he claims that he was denied his right to an impartial jury. Criminal defendants have a constitutional right to be tried by an impartial jury. *People v Miller*, 482 Mich 540, 547; 759 NW2d 850 (2008), citing US Const, Am VI; Const 1963, art 1, § 20. "At the outset of the trial process, *voir dire* provides an opportunity for the court and counsel to examine members of the venire for impartiality." *Pena-Rodriguez v Colorado*, 580 US 206, 220; 137 S Ct 855; 197 L Ed 2d 107 (2017). "To the extent that defendant maintains that the process did not result in an impartial jury, defendant has the burden to show that a particular juror was not impartial or, at the very least, that the juror's impartiality was in reasonable doubt." *People v Haynes*, 338 Mich App 392, 411; 980 NW2d 66 (2021).

Swider claims that jurors had formed opinions of the case against him during voir dire. But Swider fails to identify evidence of partiality by any particular jurors that were selected and has therefore failed in his burden to establish a violation of his right to an impartial jury. See *Haynes*, 338 Mich App at 411. The fact that at least four venirepersons were excused for cause due to acknowledged or perceived biases shows that the trial court engaged in a process designed to remove partial jurors from the pool.

Swider also alleges "extreme gender bias" because 11 of the 14 selected jurors were female. He offers no evidence of gender bias on the jury. Instead, he engages in his own stereotyping, suggesting that the majority-female jury was biased against him because "most, if not all" of them had likely been "sexually penetrated" during their lifetimes. It is, of course, absurd to claim that females, as a class, cannot impartially sit on a jury in a sexual assault case against a female victim.

-12-

Lack of merit aside, Swider also abandoned his impartial-jury claims by failing to offer any legal or factual support for them. See *McPherson*, 263 Mich App at 136.

Swider additionally alleges error by the prosecutor and the trial court during the voir dire examination of prospective jurors. He claims that his trial counsel was ineffective for failing to object to the purportedly faulty questions. "The trial court has discretion in both the scope and the conduct of voir dire." *People v Washington*, 468 Mich 667, 674; 664 NW2d 203 (2003) (quotation marks and citation omitted). The court may conduct the voir dire or permit the attorneys to do so. MCR 6.412(C)(2). The voir dire examination of prospective jurors "should be conducted for the purposes of discovering grounds for challenges for cause and of gaining knowledge to facilitate an intelligent exercise of peremptory challenges." MCR 6.412(C)(1).

Swider cites several portions of the voir dire examination that he believes were improper. All relate to delayed disclosure by victims of sexual assault. In Swider's view, these questions by the prosecutor were improper because they "elicited speculative justification for facts not in evidence." On the first day of jury selection, the prosecutor asked several prospective jurors why, in a sexual assault case, "someone might not disclose something until later in life." Jurors offered varying responses, from shame to fear to embarrassment. The prosecutor asked a similar question on the second day of jury selection and received similar answers.

There was nothing improper with asking prospective jurors about delayed disclosure to probe their beliefs and biases. The likely purpose of this line of questioning was to weed out any jurors who might have discredited a complainant's allegations merely because of a delayed disclosure. Throughout the voir dire examination in this case, the trial court repeatedly reminded prospective jurors about the presumption of innocence and excused multiple jurors for cause when they expressed "a predetermination as to the credibility of a witness that they have not heard from." Questions by the prosecutor about delayed disclosure were neither improper nor prejudicial to Swider; they were reasonably related to "discovering grounds for challenges for cause and of gaining knowledge to facilitate an intelligent exercise of peremptory challenges." MCR 6.412(C)(1). They were also within the discretion of the trial court to permit during voir dire examination. See *Washington*, 468 Mich at 674.

Because Swider's argument about voir dire questioning lacks merit, his ineffective-assistance claim necessarily fails. "Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010). We could also consider Swider's ineffective-assistance claim abandoned for failing to brief the merits of the argument. See *McPherson*, 263 Mich App at 136.

Swider further asserts that jury deliberations were unfairly influenced by requiring the jurors to wear masks during the COVID-19 pandemic. He implies that the jury quickly found him guilty out of a desire to remove their masks. Swider's argument is speculative and unsupported by fact or law, and we consider it abandoned. See *id*.

F. EIGHTH AMENDMENT CLAIMS

Swider next claims that MCL 750.520b violates the Eighth Amendment by imposing "cruel punishments absent standard proofs." Swider provides a litany of complaints about prison life—

including his inability to engage in sexual activity—without any legal support for why these conditions constitute cruel and unusual punishment. This argument is abandoned. See *id*.

Finally, Swider argues that he received excessive bail and that his pretrial detention prevented him from searching for exculpatory evidence to present at trial. The Eighth Amendment provides that "[e]xcessive bail shall not be required . . . ." US Const, Am VIII. Swider offers no legal analysis or basis for concluding that the bail imposed by the lower court violated the Eighth Amendment, so we treat this issue as abandoned. See *McPherson*, 263 Mich App at 136. We also note that claims about pretrial bail are generally rendered moot by a defendant's conviction. See *Murphy v Hunt*, 455 US 478, 481; 102 S Ct 1181; 71 L Ed 2d 353 (1982). "An issue is moot when an event occurs that renders it impossible for the reviewing court to fashion a remedy to the controversy." *People v Cathey*, 261 Mich App 506, 510; 681 NW2d 661 (2004). "[T]his Court does not reach moot questions or declare principles or rules of law that have no practical legal effect in the case before it." *People v Richmond*, 486 Mich 29, 34; 782 NW2d 187 (2010) (quotation marks and citation omitted). Because Swider has been convicted and sentenced, he is no longer being detained on pretrial bail. That fact renders his excessive bail claim moot—a favorable decision from this Court would have no practical effect on the issue. See *Cathey*, 261 Mich App at 510.

We affirm.

/s/ Michael J. Riordan
/s/ Mark J. Cavanagh
/s/ Kristina Robinson Garrett