*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

MATTHEW MIQUEL JONES,

        Defendant-Appellant.

UNPUBLISHED
October 15, 2025
11:28 AM

No. 370402
Oakland Circuit Court
LC No. 2022-282957-FC

Before: RICK, P.J., and MALDONADO and KOROBKIN, JJ.

PER CURIAM.

Defendant appeals by right his jury convictions of assault with intent to commit murder, MCL 750.83; carrying a firearm during the commission of a felony (felony-firearm), MCL 750.227b(1); and felon in possession of a firearm (felon-in-possession), MCL 750.224f. Defendant argues that there was insufficient evidence presented both of his identity as the shooter and of his intent to murder to sustain his convictions. Defendant further argues that he was denied his right to a fair trial because the trial court improperly admitted prejudicial hearsay evidence. In defendant's Standard 4 brief,[1] he asserts that his trial counsel was ineffective for failing to provide exculpatory evidence. Finding no error requiring reversal, we affirm defendant's convictions.

## I. BACKGROUND AND FACTS

This appeal arises out of the shooting of Kevin Kessler on November 1, 2022. Kevin married Nicole Kessler in 2001, later sharing two daughters. In November 2020, Nicole became romantically involved with defendant. In January 2022, Kevin filed for divorce, and the divorce was finalized in June 2022, with Kevin receiving primary custody of their daughters. At Kevin's

---

[1] See Administrative Order No. 2004-6, 471 Mich c, cii (2004).

request, the family court entered an order stating that his daughters were not to be around defendant.

Kevin moved to a condominium in Farmington behind the Fresh Thyme Market ("the market") and began a regular morning routine with his daughters, with his elder daughter driving herself to school, and Kevin dropping his younger daughter off at the bus stop on his way to work. When Kevin left the condominium at about 7:10 a.m. on November 1, 2022, he noticed that the rear passenger tire of his truck was flat, and on closer inspection, realized that his tire had been slashed. Kevin retrieved his elder daughter's car, driving her to school and his younger daughter to the bus stop, before returning home. At some point, Kevin called and left a voicemail for Detective Jacob Cote, of the Farmington Police Department, stating that he believed either Nicole or defendant was responsible for slashing his tire.

After calling 911 at about 8:15 a.m. to report the slashed tire, Kevin was in his driveway, waiting for the police and taking pictures of the tire, when he felt his lower body go numb. Kevin realized that he had been shot as he fell to the ground, before hearing more gunshots coming from the direction of the parking lot. When Kevin looked toward the sound of the gunshots, he saw defendant about "12 feet, 15 feet" away, holding a handgun. Kevin was familiar with defendant because of his involvement with his ex-wife, and had seen a photograph of him in April 2021. Kevin called 911 again, telling the operator he was shot, but lost consciousness as the operator tried to ask more questions.

As Kevin was transported to the hospital, Commander Justin Dulong of the City of Farmington Department of Public Safety canvassed the scene for potential witnesses. The market had several surveillance cameras facing the public parking lot in front of Kevin's condominium, and the footage played for the jury showed a silver Ford Fusion with no license plate entering the parking lot at about 6:30 a.m., staying for about 25 minutes, before leaving and returning closer to 8:00 a.m. At that point, an individual wearing a light-colored shirt exited the passenger side of the Fusion, walked toward an area with trees, and moments later ran back to the vehicle, getting in the passenger side before the vehicle took off. Commander Dulong also reviewed the surveillance footage from the days preceding the shooting, and observed that the same silver Ford Fusion with no license plate entered the parking lot at the same time on two previous occasions, staying for about an hour each time.

Police developed a general description of the suspect based on the witness statements and the surveillance footage as follows: "[A] light skinned black male about five-11 wearing a hooded sweatshirt [who] had gotten into the passenger side of a silver Ford Fusion with all tinted windows except for the front windshield." Commander Dulong created a photographic lineup of possible suspects who roughly matched the description of the person in the video. The lineup included a photograph of defendant because Commander Dulong knew that Kevin and Nicole had a contentious divorce and that Nicole was dating defendant. When Kevin regained consciousness in the hospital, he identified defendant as the shooter from a photographic lineup.

Defendant was arrested and a search warrant was obtained and executed for the vehicle he was stopped in, from which two cellular phones were recovered, one belonging to a number ending in 5783 ("the 5783 phone"). Commander Dulong searched defendant's information in Oakland County's Courts and Law Enforcement Management Information System ("CLEMIS"), which

returned multiple telephone numbers associated with defendant, one being the 5783 phone, which another police officer had used to contact defendant in December 2021. When Commander Dulong searched the 5783 phone, he found several hundred text messages and phone calls to a number later identified as belonging to Kristina Peterson. After learning that Peterson owned a Ford Fusion, Commander Dulong drove by her place of employment, where he observed a silver Ford Fusion with the same style of tinted windows from the surveillance footage.

When asked if he recognized the victim when he arrived at the scene, Commander Dulong explained that he recognized Kevin from a previous police complaint that Kevin had filed in July 2022. On cross-examination, after Commander Dulong agreed that Kevin was "already familiar" with what defendant looked like, defense counsel asked:

> *Q.* And you would also agree with me that prior to doing this lineup, Mr. Kessler had made numerous, I guess, complaints or maybe inquiries about—in regards to [defendant], correct?
>
> *A.* Yeah, he had—he had—I had spoken with Mr. Kessler in July of 2022 and he had concerns about [defendant] at that time.

On redirect, the prosecutor referenced this questioning, asking Commander Dulong:

> *Q.* Detective, on a cross-examination, you testified that there were prior incidents between [defendant] and Kevin Kessler that you had addressed in the past?
>
> *A.* Yes, in July of 2022, Kevin Kessler called the Farmington Police Department to report a child custody issue that he was having with his ex-wife. Part of that issue was that there was a—a Glock firearm at his—

At this point, defense counsel objected, arguing that the testimony was inadmissible hearsay. The trial court noted the objection for the record, but ruled that defense counsel had "asked the question. I think you did open the door. You alluded to them having issues previously and I think it's appropriate at this point in time, based on those questions, to follow up on it." The prosecutor continued:

> *Q.* So just that question, what was your response?
>
> *A.* That his—his firearm hadn't been returned to him and he was concerned because of his ex-wife's new boyfriend, which was [defendant]. [Kevin] was afraid that somehow, he would be in danger.
>
> \* \* \*
>
> Q. Okay. So, Kevin Kessler's firearm had not been returned to him?
>
> A. No.

Peterson testified at trial that she was in a casual romantic relationship with defendant. Twice in late October 2022, she picked defendant up from his residence in her vehicle, driving him to the market parking lot as he directed. Peterson identified her vehicle in the surveillance footage from the morning of the incident, explaining that she and defendant were in the parking lot talking, and "shortly after" they arrived, defendant left the Fusion for "approximately a minute, minute and a half," before returning. Peterson and defendant then drove out of the parking lot, returning after "approximately an hour or so." Defendant got out of the vehicle again and Peterson heard gunshots before defendant returned to the vehicle with a black bag that looked like it contained the end of a pistol. Defendant told Peterson "to go and tried to make [her] drive forcefully," pushing her foot on the gas pedal and attempting to steer the Fusion. When they arrived back at defendant's residence, defendant informed Peterson that the license plate of the Fusion was not attached, removing it from the trunk and helping her reattach it. Defendant explained to Peterson that "he had no choice" because "a pedophile [was] messing with his family." Peterson acknowledged that she had also been charged as a codefendant and had taken a plea to a lesser offense of aiding abetting assault to do great bodily harm, hoping that her testimony would benefit her upcoming sentence, but stated that she did not receive a plea deal or any promise of leniency in exchange for her testimony.

Defendant did not testify. At the close of the prosecution's case, the defense moved for a directed verdict on the basis of insufficient evidence of identity, which the trial court denied. Defendant was convicted and sentenced to 60 to 80 years' imprisonment for his assault with intent to commit murder conviction, 2 to 30 years' imprisonment for his felon-in-possession conviction, and 2 years' imprisonment for his felony-firearm conviction. This appeal followed.

## II. STANDARDS OF REVIEW

"This Court reviews de novo [a] defendant's challenge to the sufficiency of the evidence." *People v Meissner*, 294 Mich App 438, 452; 812 NW2d 37 (2011). We "review the evidence in the light most favorable to the prosecutor and determine whether a rational trier of fact could find the defendant guilty beyond a reasonable doubt." *People v Bailey*, 310 Mich App 703, 713; 873 NW2d 855 (2015) (citation omitted). "The standard of review is deferential: a reviewing court is required to draw all reasonable inferences and make credibility choices in support of the jury verdict." *Id*. (citation and quotation marks omitted).

A trial court's decision to admit or deny evidence is reviewed for an abuse of discretion. *People v Smith*, 336 Mich App 79, 105; 969 NW2d 548 (2021). "We review de novo preliminary questions of law, such as whether a rule of evidence or statute precludes the admission of particular evidence, and it is an abuse of discretion to admit evidence that is inadmissible as a matter of law." *Id*. at 105-106. "An abuse of discretion occurs when the court chooses an outcome that falls outside the range of reasonable and principled outcomes." *People v Unger*, 278 Mich App 210, 259; 749 NW2d 272 (2008). However, an appellate court may not reverse on the basis of improper admission of evidence "unless in the opinion of the court, after an examination of the entire cause, it shall affirmatively appear that the error complained of has resulted in a miscarriage of justice." MCL 769.26. This "requires a defendant to establish that it was more probable than not that a preserved, nonconstitutional error was outcome-determinative." *People v Nelson*, ___ Mich ___, ___; ___ NW3d ___ (2025) (Docket No. 166297); slip op at 8, quoting *People v Lukity*, 460 Mich 484, 493-495; 596 NW2d 607 (1999).

-4-

## III. ANALYSIS

## A. INSUFFICIENT EVIDENCE

On appeal, defendant first argues there was insufficient evidence of his identity as the shooter and insufficient evidence of his intent to murder to sustain his convictions. We disagree.

"The sufficient evidence requirement is a part of every criminal defendant's due process rights." *People v Wolfe*, 440 Mich 508, 514; 489 NW2d 748 (1992), amended on other grounds 441 Mich 1201 (1992). "[D]ue process requires the prosecution to prove every element beyond a reasonable doubt." *People v Oros*, 502 Mich 229, 240 n 3; 917 NW2d 559 (2018). Due process also "requires the prosecution in a criminal case to introduce sufficient evidence to justify a trier of fact in its conclusion that the defendant is guilty beyond a reasonable doubt." *People v Breck*, 230 Mich App 450, 456; 584 NW2d 602 (1998). For evidence to be sufficient for a guilty verdict, a court must determine "whether a rational trier of fact could have found the essential elements of the crime to have been proved beyond a reasonable doubt." *Meissner*, 294 Mich App at 452.

"A jury is free to believe, or disbelieve, in whole or in part, any of the evidence presented." *People v Perry*, 460 Mich 55, 63; 594 NW2d 477 (1999). "The credibility of identification testimony is a question for the trier of fact that we do not resolve anew." *People v Davis*, 241 Mich App 697, 700; 617 NW2d 381 (2000). "[A] reviewing court is required to draw all reasonable inferences and make credibility choices in support of the jury verdict. The scope of review is the same whether the evidence is direct or circumstantial." *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000). "We defer to the credibility assessments made by a jury." *People v Blevins*, 314 Mich App 339, 357; 886 NW2d 456 (2016).

Defendant was convicted of assault with intent to murder, felon-in-possession, and felony-firearm. To prove assault with intent to murder, the prosecution must prove beyond a reasonable doubt that defendant committed: "(1) an assault, (2) with an actual intent to kill, (3) which, if successful, would make the killing murder." *People v Brown*, 267 Mich App 141, 147; 703 NW2d 230 (2005) (quotation marks and citation omitted). To prove felon-in-possession, the prosecution must establish that: (1) defendant possessed a firearm; (2) defendant was previously convicted of a specified felony; and (3) fewer than five years have passed since defendant "paid all fines, served all terms of imprisonment, and completed all terms of probation or parole imposed for the offense." *People v Perkins*, 262 Mich App 267, 269-270; 686 NW2d 237 (2004), abrogated in part on other grounds by *People v Smith-Anthony*, 494 Mich 669, 682-683 (2013), citing MCL 750.224(f)(2)(a). "The elements of felony-firearm are that the defendant possessed a firearm during the commission of, or the attempt to commit, a felony." *People v Avant*, 235 Mich App 499, 505; 597 NW2d 864 (1999).

## 1. IDENTITY

Defendant first disputes that the prosecution presented sufficient evidence to establish his identity as the shooter. "Identity of the perpetrator is an element in every criminal case." *People v Galloway*, 335 Mich App 629, 641; 967 NW2d 908 (2020). "Circumstantial evidence and the

-5-

reasonable inferences that arise from that evidence can constitute satisfactory proof of the elements of the crime." *Blevins*, 314 Mich App at 357.

Here, a rational trier of fact could draw reasonable inferences from the evidence that defendant's identity was established beyond a reasonable doubt. Defendant argues that the descriptions given by the various eyewitnesses do not accurately describe him because they vary regarding the color of his shirt and whether he was a light-skinned or dark-skinned Black male, and presses on the fact that Kevin did not identify defendant as the shooter until he was in the hospital. However, the jury could infer from Kevin's testimony that he did not tell the 911 operator that defendant was the shooter because he lost consciousness before he could. Further, Kevin, who was familiar with what defendant looked like, identified defendant as the shooter in a photographic lineup at the hospital, and in response to defense counsel questioning whether it was "fair to say you can't give any other description [of the shooter] than the fact that you believe that it was [defendant]," Kevin agreed, stating: "Correct. I saw his face." This Court has observed that a positive identification by a witness may provide sufficient evidence to support a conviction. *Davis*, 241 Mich App at 700. Here, regardless of the slight variations and inconsistencies in the eyewitness testimony, Kevin's identification was sufficient to establish defendant's identity as the shooter beyond a reasonable doubt.

Additionally, strong circumstantial evidence of identity supported defendant's conviction. A hand-drawn map of Kevin's condominium was found at defendant's residence, and searching the 5783 phone recovered from defendant's vehicle at the time of his arrest, Commander Dulong found hundreds of texts and calls between defendant and Peterson, who owned a silver Ford Fusion. Peterson's testimony, in combination with surveillance footage, also places him at the scene and strongly supports a finding that he was the shooter. Peterson identified the silver Ford Fusion in the surveillance footage as her vehicle, and testified that she drove defendant to the parking lot the morning of the shooting, heard gunshots after he exited her vehicle, and saw defendant holding a black bag with the tip of a pistol visible when he rushed back. Defendant tried to force Peterson to drive faster out of the parking lot, telling her that he had no choice because of "a pedophile messing with his family," and that she "would cry if [she] knew what he did to little boys."

Defendant also argues that there is insufficient evidence that the phone ending in 5783 belonged to him. Federal Bureau of Investigation ("FBI") Special Agent Bryan Toltzis testified that the 5783 phone records were "consistent with the phone being in the geographic area of the crime scene" between 7:40 a.m. and 8:17 a.m. on November 1, 2022, and evidence showed that the phone was used to search the internet on November 1, 2022 for "how long can police hold a person of interest of a murder case," "24hours [sic] criminal lawyers," "how long does [sic] [interrogations] last," "what does person of interest [mean]," and "farmington [sic] police department."

The crux of defendant's argument centers on the testimony of Edward Wagrowski, an expert in the field of cell phone forensics. Because Wagrowski testified that he received the 5783 phone on November 1, 2022 or November 2, 2022, but it was not recovered until November 4, 2022, defendant asserts that it is impossible that the phone belonged to him. On cross-examination, Wagrowski testified that he did not know the exact date he received the 5783 phone, stating that it was "either that night or that afternoon after the incident or the next day," before agreeing that

defense counsel's suggestion of November 1, 2022 or November 2, 2022 "would sound right." The phone's cellular phone tower data shows that it was still in use on November 3, 2022, and because Wagrowski received multiple cellular phones during the investigation, it is more likely that Wagrowski that mistakenly agreed with the dates offered to him by defense counsel. Regardless, more than sufficient evidence was presented connecting the 5783 phone to defendant because it was recovered from his vehicle at the time of his arrest, it was subsequently linked to defendant through CLEMIS due to a prior police contact defendant had in December 2021, and it contained hundreds of texts and calls to Peterson.

## 2. INTENT TO KILL

Defendant next challenges whether the prosecution presented sufficient evidence of intent to kill. Because it can be difficult to prove intent directly, "minimal circumstantial evidence will suffice to establish the defendant's state of mind, which can be inferred from all the evidence presented." *People v Kanaan*, 278 Mich App 594, 622; 751 NW2d 57 (2008). A defendant's intent to kill may be inferred from

> the nature of the defendant's acts constituting the assault; the temper or disposition of mind with which they were apparently performed, whether the instrument and means used were naturally adapted to produce death, his conduct and declarations prior to, at the time, and after the assault, and all other circumstances calculated to throw light upon the intention with which the assault was made. [*People v Taylor*, 422 Mich 554, 568; 375 NW2d 1 (1985) (citation and quotation marks omitted).]

Evidence of intent to kill can also include the "use of a deadly weapon, taking aim at a victim, injury to the victim, evidence of flight and attempts to hide evidence." *People v Everett*, 318 Mich App 511, 531 n 10; 899 NW2d 94 (2017).

Defendant argues there was insufficient evidence presented to establish his intent to kill because Kevin was shot in the hip rather than the "upper body or the head area." According to defendant, Kevin testified that the shooter was "a little bit far away," whereas someone who intended to kill would "get close enough to assure an accurate shot." Viewed in the light most favorable to the prosecution, however, the evidence presented supports the jury's conclusion that defendant had the intent to kill when he shot Kevin. Peterson testified that defendant removed the license plate from her vehicle, before directing her to drive him to the area around Kevin's condominium multiple times in the mornings during the week leading up to the shooting. Kevin testified that he followed a regular morning routine, dropping his young daughter off at the bus stop before heading to work. This evidence suggests that defendant was casing Kevin's residence, as on the morning of the shooting, Kevin's tire was slashed, preventing him from driving to work. Circumstantial evidence indicates that defendant slashed the tire, as Peterson identified her vehicle in the surveillance footage on the morning of the incident and testified that soon after arriving, defendant left the vehicle for a about a minute and then returned. Further, Peterson testified that she and defendant waited in the area during the time that Kevin drove his daughters to school, returning to the parking lot after about an hour, once Kevin was home. And there was no evidence that Peterson received a plea deal or promise of a lenient sentence for her own criminal charge in exchange for her testimony.

Kevin testified that defendant then shot at him from "12 feet, 15 feet" away, hitting him around his right hip and causing him to fall to the ground. Defendant continued firing once Kevin was already down, with bullets piercing the side of Kevin's truck and shattering the window. After the shooting, Peterson testified that defendant fled in her vehicle, attempting to force her to drive faster by pushing her foot on the gas pedal and attempting to steer the vehicle. After defendant was arrested, police found a hand-drawn map of the crime scene at his residence, but the weapon was never recovered. From the evidence presented of defendant's actions before and after the shooting, along with the dangerous weapon used and number of bullets fired, a rational trier of fact could reasonably infer that defendant shot at Kevin with the intent to kill. See *Meissner*, 294 Mich App at 452; *Taylor*, 422 Mich at 568. Defendant's failure to have better aim, or the fact that he did not move closer to Kevin before shooting, is unavailing in light of the plethora of evidence supporting intent.

In sum, when viewing all of the evidence in a light most favorable to the prosecution, the jury could have reasonably concluded beyond a reasonable doubt defendant was the shooter and had the requisite intent to kill. Because there is sufficient evidence to support defendant's convictions, his due-process rights were not violated. See *Breck*, 230 Mich App at 456.

## B. HEARSAY EVIDENCE

Defendant next argues that he was denied the right to a fair trial because the trial court abused its discretion in admitting prejudicial hearsay evidence at trial. While we agree that the trial court abused its discretion by allowing the evidence in, defendant is not entitled to reversal of his convictions.

"In general, hearsay—an out-of-court statement offered to prove the truth of the matter asserted—may not be admitted into evidence." *People v Green*, 313 Mich App 526, 531; 884 NW2d 838 (2015). See MRE 801; MRE 802. "If, however, the proponent of the evidence offers the statement for a purpose other than to prove the truth of the matter asserted, then the statement, by definition, is not hearsay." *People v Musser*, 494 Mich 337, 350; 835 NW2d 319 (2013). Hearsay is inadmissible unless it "falls under one of the hearsay exceptions set forth in the Michigan Rules of Evidence." *Id.* at 350 (citation omitted). See MRE 802; MRE 803. A preserved, nonconstitutional error is grounds for reversal when, "in the context of the untainted evidence," it is "more probable than not that a different outcome would have resulted without the error." *Lukity*, 460 Mich at 495-496.

Defendant argues that Commander Dulong's testimony regarding Kevin's prior out-of-court statement that Kevin was in danger because defendant did not return his gun was inadmissible hearsay. This testimony was offered in response to the prosecutor's question on redirect, "you testified that there were prior incidents between [defendant] and [Kevin] that you had addressed in the past?" Specifically, Commander Dulong testified that "in July of 2022, Kevin Kessler called the Farmington Police Department to report a child custody issue that he was having with his ex-wife. Part of that issue was that there was a—a Glock firearm at his—" Defense counsel objected on hearsay grounds, and the trial court overruled the objection. Prompted by the prosecution to finish his answer to the question, Commander Dulong continued that "[Kevin's] firearm hadn't been returned to him and he was concerned because of his ex-wife's new boyfriend,

which was [defendant]. He was afraid that somehow, he would be in danger." The prosecution then asked, "So, Kevin Kessler's firearm had not been returned to him?" and Commander Dulong answered, "No."

The prosecution counters on appeal that Commander Dulong's testimony regarding Kevin's prior concerns related to defendant possessing Kevin's gun was not hearsay because it was offered "to elaborate on Commander Dulong's cross-examination testimony, i.e., to explain why both Kevin and Defendant were known to the police and to give context to their prior relationship." We note that the prosecutor at trial seemingly conceded that the statements were inadmissible hearsay because she did not argue otherwise, instead arguing that defense counsel "opened the door," and that she was "just following up on that."

In any event, it is clear that this testimony was offered to prove the truth of the matter asserted. The prosecutor had already established on direct examination that Commander Dulong was familiar with Kevin because of contact regarding a previous unspecified incident in July 2022, so eliciting more testimony about the police's knowledge of Kevin was unnecessary. The prosecution had also established that Kevin had a court order prohibiting contact between the children and defendant from his divorce proceedings with Nicole, who was romantically involved with defendant during their marriage. Further, the prosecutor did not ask anything regarding the context of the relationship between Kevin and defendant, instead inviting Commander Dulong to complete his thought, which had ended with explaining that Kevin had a child custody issue involving a Glock firearm, and then further pressed Commander Dulong on whether it was true that "[Kevin]'s firearm had not been returned to him?" This follow-up question indisputably sought to establish the truth of the matter asserted by Kevin's hearsay statement.

The trial court allowed the hearsay testimony, finding that it was appropriate to follow up on the issues "a little bit further" because defense counsel "open[ed] the door" by alluding to defendant and Kevin having previous issues. A defendant typically "opens the door" to admission of otherwise inadmissible evidence when it inquires into or refers to such evidence. See *People v Figgures*, 451 Mich 390, 399-400; 547 NW2d 673 (1996). On appeal, the prosecution does not argue the testimony falls under any hearsay exception, instead agreeing with the trial court that defendant "opened the door," and asserting that our Supreme Court "has long recognized that the admission of otherwise inadmissible hearsay is not error requiring reversal if the complaining party has opened the door to its use." Indeed, our Supreme Court has observed that the admission of inadmissible testimony is not unfairly prejudicial when a defendant "opened the door." See *People v Pickens*, 446 Mich 298, 337-338; 521 NW2d 797 (2004).

However, as stated above, the first mention of previous issues between Kevin and defendant was elicited by the prosecutor, not defendant. After establishing that Commander Dulong recognized Kevin because he had reported a previous incident, the prosecutor asked no further questions regarding the details of the prior police complaint. On cross-examination, defense counsel asked Commander Dulong if it was correct that Kevin "had made numerous, I guess, complaints or maybe inquiries about—in regards to [defendant]," and Commander Dulong responded that he spoke with Kevin "in July of 2022 and he had concerns about [defendant] at that time." On redirect, the prosecutor then asked about Commander Dulong's previous testimony about prior incidents between Kevin and defendant, eliciting the responses about the missing

Glock firearm and Kevin's concerns about being in danger because defendant and his ex-wife had not returned it.

Moreover, the rebuttal evidence was not responsive to defendant's theory of the case as explored on cross-examination. "Opening the door is one thing. But what comes through the door is another. [T]he test of whether rebuttal evidence was properly admitted is . . . whether the evidence is properly responsive to evidence introduced or a theory developed by the defendant." *People v Thorpe*, 504 Mich 230, 253-254; 934 NW2d 693 (2019) (quotation marks and citations omitted). In *Thorpe*, our Supreme Court found that the defense counsel did not open the door to testimony "regarding the rate of false reports in child sexual abuse cases simply by asking him on cross-examination whether children lie or manipulate," because the questions asked "were discrete, straightforward, and uncontroversial questions of fact." *Id.* at 254. "To maintain that these basic questions *invited* the prosecution to elicit [inadmissible] expert testimony . . . would essentially require defense counsel to read tea leaves before asking any questions." *Id.*

Here, defense counsel likewise did not open the door to evidence that defendant was refusing to return Kevin's firearm simply by asking Commander Dulong a yes-or-no question as to whether Kevin had made prior complaints regarding defendant. Defense counsel did not ask any questions regarding the substance of Kevin's prior complaints, and the question came in a sequence related to Kevin's familiarity with defendant before identifying him as the shooter in the photographic lineup. Defense counsel's theory of the case was that Kevin identified defendant because he knew him. Similar to *Thorpe*, defense counsel asked a "discrete, straightforward, and uncontroversial question of fact." *Thorpe*, 504 Mich at 254. Introducing hearsay testimony about another gun-related accusation against defendant was not a proper rebuttal to the testimony elicited from defense counsel on cross-examination, especially considering that the prosecutor was the first to introduce information about the July 2022 complaint.

However, defendant is not entitled to reversal of his convictions because we conclude that it is unlikely that the trial court's error in admitting this evidence was outcome-determinative. See MCL 769.26; *Nelson*, ___ Mich at ___; slip op at 8. Commander Dulong confirmed that Kevin's missing firearm was not the same firearm used in his shooting. In addition, evidence was already in the record regarding Kevin's custody battle with Nicole and Nicole's extramarital relationship with defendant, including testimony from Kevin regarding a court order he requested blocking his daughters from being around defendant. Further, as previously discussed, strong evidence was presented establishing defendant as the shooter without the additional evidence offered regarding Kevin's concerns that defendant had his gun. Accordingly, the trial court's error does not entitle defendant to relief on this issue. See *Lukity*, 460 Mich at 495-496.

## C. STANDARD 4 BRIEF

In defendant's supplemental brief filed *in propia persona*, otherwise known as a "Standard 4" brief, he asserts that trial counsel was ineffective: 1) for failing to enhance the surveillance footage from the market, claiming if the footage was enhanced, it would provide exculpatory evidence proving that defendant was not the shooter; and 2) for failing to present Peterson's confession letter at trial. However, defendant does not provide any factual or legal support for his claims. Commander Dulong testified that the surveillance footage could not be enhanced because

"it pixilates" when zoomed in, and defendant does not provide any factual basis to contest this. Nor did defendant provide the confession letter he references to this Court. "The failure to brief the merits of an allegation of error constitutes an abandonment of the issue." *People v McPherson*, 263 Mich App 124, 136; 687 NW2d 370 (2004). "An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment with little or no citation of supporting authority." *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998). Because defendant has provided no argument or analysis to support his claims, nor any citation to relevant authority, defendant's cursory ineffective assistance of counsel claims are abandoned and we need not address them. See *McPherson*, 263 Mich App at 136; *Kelly*, 231 Mich App at 640-641.

  Affirmed.

        /s/ Michelle M. Rick
        /s/ Allie Greenleaf Maldonado
        /s/ Daniel S. Korobkin